## DUNN v. The COMMONWEALTH.

The act of 1718, so far as it relates to the judgment or sentence in criminal cases, is still in force.

In capital felonies, the record must show that the prisoner was present at the trial, verdict, and passing of the sentence.

Where the record recited " the court sentence *George Dunn, the defendant*, to be taken, &c., whence *you* came," there is not sufficient evidence of his presence at the passing of the sentence.

IN error from the oyer and terminer of Allegheny county.

*Sept.* 13. The record in this case showed a true bill for murder in the first degree found against Dunn. It then proceeded: "And now, to wit, Nov. 11, 1844, the defendant being arraigned pleads *non cul.*" Issue was joined, and " a jury being called, there came," &c., " empannelled and sworn, Nov. 13, 1844, who," &c., " say that defendant is guilty," &c. A motion for a new trial and in arrest of judgment having been overruled, the record proceeded: "And now, to wit, Nov. 26, 1844, the court sentence George Dunn, the defendant, to be taken to the jail in Allegheny county, from whence you came, and from thence to the place of execution, which is to be within the jail wall, and there to be hanged," &c.

*Alden* and *McCandless*, for plaintiff in error.—It is essential that the record show that the prisoner was called upon to say why sentence of death should not be pronounced: 4 Black. Com. Appen. 356; 1 Chit. Cr. L. 700; Geary *v.* King, 1 Show. 127; King *v.* Harris, 1 Lord Raym. 267; King *v.* Spike, 3 Salk. 358; King *v.* Perin, 3 Saund. 392; Doebler *v.* Comm., 3 Serg. and Rawle, 237.

*Magraw*, contrà, referred to three cases among the records of the court below, to show the practice of making up the records in that county.

*Sept.* 23. COULTER, J.—In criminal jurisprudence, forms of trial are conducive to the liberty and safety of the citizen. They were first established for that end, and have been resolutely asserted and maintained in England, by the distinguished ornaments of the legal profession, against the encroachments of the crown in times of political persecution; and even by the crown lawyers, in cases where the prerogatives, or interests, of royalty were not concerned. These forms were brought to this state by our fathers, with the inheritance of the common law; and it was doubtless with a view more especially to criminal trials, that the clause in the bill of rights, which provides that "trial by jury shall be as heretofore," was inserted. The 6th section of the act of Assembly of 31st May, 1718, enacts that, in cases which affect life, the judgment and execution shall be as in England. This section, in the late edition of our laws, is marked as obsolete; but, as length of time will not repeal a statute, I know not by what authority it is so marked. The place of execution and the manner is altered by our statute of the 10th April, 1834; but, in relation to the *judgment or sentence*, there is no alteration in any statute as to form or manner of its rendition. The first section of the same act, which enacts that in case of high treason the trial shall be by due order and course of the common law, remains on our statute book without any mark of *non user*, and in full force. As the trial for murder may result in the extinction of the life of a human being, which is the worst event that can be accomplished in the trial for high treason, I can see no reason for relaxing the rules of trial in one case more than in the other.

This statute of 1718 is the ground-work of our criminal law, and so remains on the statute book. The legislature, though they have brushed away some of the common-law forms attending the jury trial in civil cases, which were unsubstantial, to their distinguished honour have left untouched the common-law forms which regulate trials that affect life; these they have trusted to the watchful guardianship of the courts having jurisdiction over such crimes. Then why, under these circumstances, should this court be less circumspect than the Court of King's Bench in England, where they are less chary of human life than we are, and where their criminal code is marked with greater severity than ours. There are defects in this record which, I apprehend, all lawyers conversant with the subject will admit would not stand the scrutiny of a court of error in England. I will not say, however, that a long course of practice may not have obliterated, in this

state, some immaterial and unsubstantial forms in the conduct of criminal trials; but those which are of substance—those which protect and cover the enjoyment of life, by securing important rights to the accused, are safe and untouched, and must remain so while the constitutional mandate is observed, and until this court surrenders its conservative power.

This brings us to the inquiry whether the record of the trial, conviction and sentence, in this case, shows that every substantial right (according to the forms of the common law, as used and approved at the time of the adoption of the constitution) was secured to the prisoner. This question is answered by the fact, that it does not appear that the prisoner was present at the time the verdict was rendered against him, and leaves it doubtful whether he was present even on the trial. But it may, perhaps, be alleged that the arraignment is full evidence of his presence on the trial; and so, doubtless, it would be, if the trial immediately ensued. He was arraigned on the 11th November, 1844, and pleaded not guilty; and it is stated that a jury came, who are named, and the record then proceeds: "Men duly summoned, returned, chosen, by ballot, empannelled and sworn, Nov. 13, 1844, who, upon their oaths, do say," &c. Now, if you refer the date, November 13, to the swearing of the jury, the trial did not commence until two days after the arraignment, and it might be as good evidence of his presence two weeks after as two days, which renders his presence at the trial uncertain, from the evidence of the record. But, if you refer the date, November 13, to the rendition of the verdict alone, and not to the trial, then there is not record evidence that the prisoner was then present.

The difficulty arises from the interposition of the word "who," immediately after the date, which would seem to disjoin the rendering the verdict from that date, and assign it to the time of swearing the jury; which, as I have stated, was two days after the arraignment. But, view it in any aspect, it makes the record doubtful and uncertain; and no man can predicate of it, that the arraignment shows that the prisoner was present at the swearing of the jury and the rendition of the verdict. This presents a state of confusion and uncertainty in the record which cannot be relieved by any justifiable presumption, in a case involving the life of a fellow-being. We sit here, as a court of error, to review the record, and can determine what was done only from the evidence of the record. It is not necessary to resort to English authorities on the subject. I shall refer only to American cases, considering

the matter fully settled in England. In the case of the State v. Franer, 1 Overton, 434, it was decided that, for crimes affecting life or limb, the prisoner must be present when the evidence is given in, during the trial, and *when the verdict is returned;* and, in 1 Wend. 91, it was ruled that in a capital case the prisoner must be present when the verdict is rendered. How, then, can we say that the prisoner was present, except from the evidence of the record? Nothing was more easy than to state that the prisoner was brought into court; and, if it does not show the fact, or is so confused and uncertain that the mind cannot rest on it with comfort, what safe course remains for this court but to reverse the proceedings? The judgment of our own courts relieve us in this particular, as to the propriety of indulging presumptions. In the case of Doebler v. the Commonwealth, 3 Serg. & Rawle, 237, the defendant was put on his trial for felony, but not of death. Some time after the trial commenced, the court perceived that one of the jury, George Fisher, was insensible from intoxication, and directed him to withdraw, and another juror to be called in his place, of which a record was made—the attorney for the Commonwealth consenting, and the attorney for the prisoner neither assenting nor dissenting. The record states that twelve jurors came, &c., but only eleven are named—the name of George Fisher being omitted —the one called in his stead making the twelve. But the court reversed the judgment, because it did not appear, *from the record,* that twelve jurors were sworn. This is a strong case, stronger than the one in hand, and establishes that presumptions are not to be allowed when they would arise almost inevitably from the record. In the case of Jacobs v. the Commonwealth, 4 Serg. & Rawle, 315, it was determined that, in all cases which were once felony of death, it must appear from the record that the defendant was arraigned, although the record showed that the defendant pleaded not guilty; and the judgment was reversed. At the rendition of the verdict, the prisoner is entitled to have the jury polled, so that each one shall answer on his own responsibility, face to face with the prisoner, as to his guilt or innocence.

This has been deemed one of the material hedges and safeguards which 'the common-law forms throw around a person tried for life, and therefore it ought to appear distinctly from the record that he was afforded an opportunity to avail himself of it.

In addition to this, there is not sufficient evidence on this record that the prisoner was present when sentence or judgment was entered. In New York, it has been decided that, where corporal

punishment is part of the sentence, the prisoner was present when it was pronounced, 12 Wendell, 344; and in 7 Cow. 525, it was decided that imprisonment was corporal punishment under that rule.    In New York, the decisions give no other reason than that it is an ancient rule of the common law, and that no warrant of re-caption can issue against the prisoner unless he is present when it is pronounced.    But, to my mind, there is a stronger reason. If the prisoner is a female, she may, after conviction, and up to the moment of passing sentence, plead pregnancy when the sentence is that of death, so as not to destroy the innocent and unoffending with the guilty, which plea shall be tried by a jury of matrons, 1 Bay, 487; and there can be no distinction between the law on the subject, as to male or female.    The prisoner, therefore, ought to know when sentence is to be passed, and be present to the last moment given for the exercise of this right which is to save the innocent.    The prisoner might be languishing in sickness, and in the process of removal to a higher tribunal, which would render the sentence of our law unnecessary; and, as we execute judgment in mercy, the prisoner ought to be present at his sentence, to let all see that he was not about to expire in his cell.

There is no evidence that the prisoner was brought into court at the time sentence was recorded, except what may be presumed or inferred from the words of the sentence itself, which commenced as follows :—" The court sentence George Dunn, the defendant, to be taken to the jail of Allegheny county, from whence *you* came," &c.    It is too grave a subject to allow verbal criticism; but the common-sense import of the words seems to be, that " George Dunn, the defendant," and "*you*," mean different persons ; at all events, the words are equivocal and uncertain.    The whole seems to be a clumsy attempt at recording the common forms of a sentence, which might be recorded as well, whether the prisoner was absent or present.    When a prisoner is arraigned, the entry is that he pleads "not guilty, &c.;" but, if the entry is "prisoner (or defendant) pleads not guilty" alone, it will not be presumed that he was arraigned, as in Jacob v. Commonwealth : so here, if the sentence had been correctly recorded, it would not, therefore, be presumed that the prisoner was there to hear it.

How easy would it have been for the clerk to enter that "*the prisoner being brought into court, and asked, &c., the court proceeded to sentence him to death as follows, &c.;*" and how easy is

it, in such cases, for the court to see, that, in a matter of life and death, it *is* so entered.

We may safely presume, as individuals, that, in tranquil times, and in an enlightened city, the conduct of the trial was all right; but, as a court, we can look only to *the record*, for this record and judgment will be recorded as a precedent for other times; and, if we let in presumptions to supply omissions and defects in records, it will by and by be deemed scarcely necessary to show by the record any of the important safeguards of the trial by jury; and the common-law-forms stoutly asserted as a shield of liberty, by the Hampdens, Russels, and Sidneys of other days, will lose their value. But forms are not merely a shield against the despotism of kings, for there is occasionally a despotism in all countries—a despotism whose terrible voice is heard in tumults and excitements—in the rage of unrestrained and impetuous will. It is then that the stern and inflexible rules of the common-law trials by jury will best prove their importance and value. In the last ten or twenty years there have been mock trials and bloody executions, without the forms of law, in these states,—a thing which would have been deemed impossible in the primitive days of the republic.

The judgment of this court is, that it does not sufficiently appear by the record that the prisoner was present at the trial, particularly at the rendition of the verdict, nor when sentence of death was passed. Every record of this kind ought to show clearly that the prisoner was tried and sentenced, and is to suffer according to the substantial forms of the law. We cannot say *that* of *this* record, and the judgment and sentence is therefore reversed, and the prisoner is discharged.

After the opinion of the court had been delivered, his honour, Mr. Justice BELL, stated that he thought it sufficient for a reversal of the judgment and sentence, that no *allocatur* had been set forth upon the record; that the prisoner had not been asked "whether he had any thing to say why sentence of death should not be passed." It was a material part of the record which had thus been omitted.

Mr. Justice ROGERS thought the *allocatur* had been substantially, although very informally, set forth.

GIBSON, C. J., concurred with Mr. Justice Bell.