188          429
209          ¹206

# Commonwealth of Pennsylvania *v.* Jonas Preston, Jr., Appellant.

*Criminal law—Murder—Sentence—Permitting prisoner to speak before sentence—Practice, oyer and terminer.*

. A sentence of guilty of murder of the first degree will not be sustained where it appears from the record that the prisoner was not asked before sentence why sentence of death should not be pronounced upon him. The omission does not call for a reversal; the sentence only will be set aside.

*Criminal law—Murder—Insanity—Evidence—Question for jury.*

On the trial of an indictment for murder where insanity is pleaded, but where there is no evidence that the prisoner's conduct had been violent, or that it had been such as to indicate violence, and the most that was

shown was that on a few occasions separated by long intervals of time his conduct had been childish, it is proper for the court to leave to the jury to determine the mental condition of the prisoner at the time he committed the crime, from the proof of his mental condition immediately before and immediately after the act.

On the trial of an indictment for murder where the court states in its charge that a witness on the question of his sanity had testified that he had employed the prisoner for four or five years, when as a matter of fact the witness had said four or five months, but when it also appears from the evidence that this employment was ten years before the trial, and that witness had seen the prisoner frequently in the mean time, the period of his employment was immaterial, and the mistake did the prisoner no harm. If it had been considered a matter of any importance, the attention of the court should have been called to it at the time.

Argued Oct. 28, 1898. Appeal, No. 336, Jan. T., 1898, by defendant, from judgment of O. & T. Chester Co., April T., 1898, on verdict of guilty of murder of the first degree. Before GREEN, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Sentence set aside and record remitted.

Indictment for murder.    Before HEMPHILL, P. J.

From the record it appeared that the prisoner was indicted for murdering his wife, Ella Preston. Insanity was set up as a defense. On this subject Thomas Underwood, called by the commonwealth, testified as follows:

"Q. Where do you reside? A. Penn township. Q. Are you acquainted with Jonas Preston, Jr.? A. Yes, sir. Q. How long have you known him? A. About fifteen years. Q. Was he ever in your employ? A. He was. Q. You are a farmer? A. Yes, sir. Q. For what period of time was he in your employ? A. About four or five months. Q. Continuously? A. Yes, sir. Q. During that period he slept at your premises? A. Yes, sir. Q. And took his meals there? A. Yes, sir. Q. You have conversed with him? A. Yes. Q. I wish you would state whether or not during this period of time you ever saw anything in his actions, behavior or conversation, different from that of a man in his station in life, an ordinary man. A. I did not."

By the Court: "Q. When was this he was with you? A. About ten years ago now."

Cross-examined: "Q. About ten years ago he was in your

employ? A. Yes.  Q.  Have you seen anything of him since then? A. Yes, sir.  Q. Have you had any conversation with him? A. Yes, sir.  Q. Have you had any business with him since then? A. Nothing material that I can think of.  Q. Have you had any particular occasion to converse with him since then on any subject? A. Yes, I think I have, a few times, not very often. Q. Nothing of importance? A. No, sir. Q. When he was with you it was about four or five months, and that is ten years ago? A. Yes, sir."

On the subject of insanity the court charged as follows:

Now, gentlemen of the jury, if you, having passed upon the commonwealth's evidence, should reach the conclusion that the prisoner at the bar, without anything more being shown, before you approach the defense, committed the crime of murder by the killing of his wife, and then conclude in what degree he is guilty, then you will reach the defense. Because, of course, if you reach a conclusion, which it seems to me is utterly improbable, if not impossible, that there was no murder committed, or that he did not commit the murder, your verdict will be an acquittal, not guilty. But if you conclude there was murder committed, and that the prisoner at the bar committed it, and fix upon the degree, the next step you take is to consider what is the answer that the defendant has made to these seemingly overwhelming facts or evidence against him? And his plea is that he was insane. Insanity is his plea. When you reach his defense the burden shifts. The burden to establish guilt is, in the first instance, upon the commonwealth. But when the defendant sets up insanity as a defense the burden is upon him to prove it, or to satisfy you that he was insane, for the presumption of law is that every person is sane until the contrary is proved. So that the burden rests upon the one who claims to have been insane at the time of the commission of a crime to prove he was insane, the law presuming until that is shown to the satisfaction of the jury that he was sane and accountable for his actions. The test of responsibility for crime where insanity is pleaded is whether the accused was capable, and did have a criminal intent, and the capacity to distinguish between right and wrong in reference to the particular act with which he is charged. If the prisoner at the

bar had power of mind enough to be conscious of what he was doing at the time, then he was responsible to the law for his act. Bearing those definitions in mind you will inquire, was the defendant insane? Has he satisfied you that he was insane? Now I do not propose to go over the testimony at length—you have heard it, it is fresh in your mind, and you have heard it commented upon but recently—further than to say that the character of insanity set up here and shown, if it can be called insanity, was not of a character to indicate violence. At most it showed a childishness on his part. The testimony in substance was that after a certain fall which he had suffered back as far as 1874, that some years after that—how it is connected with the fall does not appear, except in the imagination or in the view of individuals—but subsequent to that fall, some years after that, he developed what are called spells; and the character of these spells was that he would talk foolish; that he would act foolish, and that he would play with sticks; that he would think he was driving horses, and that he would imagine somebody was after him; that he would ask whether people were talking about him or inquiring about him, of that harmless and childish character; nothing indicating a disposition to do wrong, to do injury or to do violence. But it does not follow from that, if you consider that sufficient evidence of insanity, that there might not be a development in another channel. It might take another turn, and might, as we all know men do at times who are insane, being perfectly harmless, become very violent and very aggressive. But a peculiar feature of these spells, as set up here, is that they were not continuous; or rather that the insanity is not claimed to have been confirmed and of a continuous character; that there were long intervals, sometimes years; I think the last one before the killing was some three years previous, at least a year or more, when he got religion or when he joined the church. That being the case the defendant must not only satisfy you that he was subject to these spells of insanity; if you, in the first place find them to be evidence of insanity—because that will be the first question, has he satisfied you these spells thus described to you are evidence of insanity—and if he has, the second question arises, had he one of these spells at the time this crime was committed? Because a man that is sane for

o

years and for months at a time, and only has short spells of insanity, the law requires that he should establish, in order to entitle himself to the protection that it gives an insane person in the commission of crime, to show that he had one of these insane spells at the time of the commission of the crime; because no matter how often or how frequently he was subject to spells of insanity, unless he was under one of these insane spells at the time he committed the crime, he is just as responsible for his acts as you or I, or any one else, because he is then a sane person. Now has he satisfied you, if you reach the conclusion that these spells were evidence of insanity, of such insanity as in law relieves the party accused from being held responsible for his acts? If you reach that conclusion then you come to the second question, has he satisfied you he had one of these spells at the time of the commission of this crime? And you are placed in the same position as you were in determining the degree of murder. It must be all inferential. He has not, apparently, declared to anybody the circumstances under which this crime was committed. [We know nothing of what occurred in that house at the time of the commission of this crime. We know not what the condition of his mind was, and you have got to determine that by ascertaining what the condition of his mind was immediately before and immediately after, as being the best and most rational guide you can take to ascertain what it may have been during the interval. The only testimony I recall, and that closest to the commission of the crime, was given by his pastor, Samuel Ruth. He tells you that he was at prayer meeting on the evening before, on the evening of February 17; that he seemed then in his normal, and in a rational, condition. I think he had a talk with him. In addition to his testimony we have that of the pastor's wife; and we have that also of a man named John L. Johnson, a colored man, and his wife, Lizzie Johnson, who were at the church and saw this man there that night in company with his wife. There was nothing, they say, to indicate there was anything whatever wrong. Now I recall no one who saw him so late before the killing as the parties I have named, four in number; and if their testimony is to be relied upon he was in his usual normal condition of mind.] [1, 2] That is the latest hour up to which, I believe, we can trace him previous to February 18. The first

.person called upon the stand who saw him after the commission of this crime was a young man named George Oatman, and he tells you he saw him a short distance from his house, going away from his house, between 11 and 12 o'clock on the morning of February 18, that he saw nothing whatever wrong with him; that he hailed him and requested him to tell Mr. Clark he would not be over there that afternoon to attend to some work which he apparently had engaged to attend to. The next person who saw him, as far as the testimony discloses, was Rebecca Cornelius. She tells you that he reached her house between 12 and 1 o'clock; that he was nervous, excited and crying. He asked her to cut his hair, which she did. The next person who saw him was his brother, George Preston, whose house he reached about 2 P. M. He tells you his condition in substance was the same as that detailed by the sister; that he was nervous and excited, and perhaps crying. From that time on until late in the evening, between 5 and 6 o'clock, he is not accounted for. Then he turns up at his father's house in the neighborhood of Jennersville, and there you will recall the testimony given by his brother-in-law, by his father and sister, who were there. Does that testimony satisfy you, if you believe these spells were spells of insanity, that he had one of these insane spells at the time of this killing? If it does, if he has established to your satisfaction that he was insane, and was insane at the time of the commission of this crime, then he is entitled to a verdict of not guilty on the ground of insanity. But if he has failed to so satisfy you—and when you are weighing the testimony on that point you must not take the testimony of the defense alone, but that of the commonwealth also—because, without attempting to recount the testimony bearing on the general question of insanity, you will recall the number of witnesses called on the one side, in the first place, to establish it—outside the family they called Isaac P. Jackson, Preston F. Powell, Benjamin Cook, Hayes A. Clark and Israel Milburn; and in addition to those some four members of his family, Jonas Preston, Sr., Rebecca Cornelius, George Preston and Elizabeth Brown. They were to establish the fact that this man was insane, or was given to spells of insanity. To contradict them the testimony offered by the commonwealth consisted of Samuel Ruth, who was his pastor, and his em-

ployer also at packing hay; Dr. Sharpless, the prison physician, who saw him after he was brought to the jail here, and he tells you that he saw no evidence of insanity and he thinks he is not insane; Louisa Ruth, the pastor's wife; William J. Johnson, who worked with him at the hay press; John L. Johnson, and Lizzie Johnson, his wife, whose testimony on the night before I have already called your attention to—R. C. Kelton, the station agent at Kelton; [Thomas Underwood, who had known him fifteen years and employed him four or five, and he slept and ate at his house while so employed; and Charles H. Effinger, who had employed him also on two or three occasions for a day or two at a time; and these people all tell you that in their judgment there was nothing wrong with him whatever,] [3] nothing out of the way. One, perhaps, tells you he was below the average of intelligence; one says he was dumb, but they all tell you in their judgment that he was not insane; that they saw nothing strange or peculiar about him in all their acquaintance with him. That is the testimony offered to you to satisfy you that this man is insane. If you reach the conclusion that these spells were not spells of insanity, but spells of childishness, or passion, or anything of that sort, not amounting to insanity, then it is not necessary for you to consider the second question, whether he was insane at the time of the commission of the act or not. But if you conclude that these spells evidenced insanity, if they satisfy your mind that at times at least he was insane, then the second question becomes a very important one, was he insane at the time this crime was committed? If he was, as I said before, you will render a verdict in his favor of not guilty on the ground of insanity. If, however, he has failed in that defense then you will recur to the first questions that presented themselves, was he guilty of this murder, and if he was, was it murder of the first or second degree?

Verdict of guilty of murder of the first degree. Sentence of death was passed upon the verdict, without the prisoner being asked immediately prior thereto if he had anything to say why sentence of death should not be passed.

*Errors assigned* were (1–3) above instructions, quoting them; (4) that the court erred in not asking the prisoner if he had anything to say why sentence of death should not be passed.

*W. S. Harris*, for appellant.—The defense of insanity should have been sustained: Kerr on Law of Homicide, sec. 514; Massengale v. State, 24 Texas App. 181.

Instructions which tend to mislead the jury as to the force and effect of testimony are erroneous: Connelly v. Walker, 45 Pa. 449; Com. v. Cleary, 135 Pa. 64.

There is no record that the defendant was ever asked at any time, by the court, why sentence of death should not be pronounced. It is a solemn fact, which will not be denied, that no such question was asked when the defendant was sentenced. This is error: Dunn v. Com., 6 Pa. 389; Dougherty v. Com., 69 Pa. 286; McCue v. Com., 78 Pa. 191.

*W. W. MacElree*, district attorney, for the commonwealth.

OPINION BY MR. JUSTICE FELL, November 7, 1898:

The assignments of error which relate to the charge of the court are without merit. No undue prominence was given, as alleged, to the evidence for the commonwealth, and that in favor of the prisoner was fully and fairly presented. It was left to the jury to determine the mental condition of the prisoner at the time he committed the crime, from the proof of his mental condition immediately before and immediately after. No safer guide than this could have been given them. There was no evidence that his conduct had been violent or that it had been such as to indicate violence. The most that was shown was that on a few occasions, separated by long intervals of time, his conduct had been childish. When the statement in the charge that if the witnesses who had seen the prisoner the night before the crime was committed were to be relied upon, he was in his usual normal condition of mind, is considered in the connection in which it was made, there is no ground for doubt or misunderstanding.

The learned judge was inaccurate in stating that a witness, Thomas Underwood, had testified that he had employed the prisoner for four or five years. It appears that the witness said that he had known him for fifteen years and had employed him for four or five months. This employment was ten years before the trial, and the witness had in the mean time seen the prisoner frequently. On the question of his mental condition when the

crime was committed the period of his employment was not material, and the error in statement did no harm. If it had been considered as a matter of any importance, the proper course would have been to have called the attention of the learned judge to it at the time.

The objection that the prisoner was not asked before sentence if he had anything to say why sentence of death should not be pronounced upon him must be sustained. This omission is not an error in the record merely, which might be amended. It was conceded at the argument that the question was not asked. That it must be asked, and that it must so appear on the record, has been repeatedly decided. The reasons for this requirement, since the prisoner may now be heard at the trial, are much less substantial than when it first became recognized as a right, but that it is a matter of substance, and not of form merely, has been settled: Hamilton v. Commonwealth, 16 Pa. 129; Dunn v. Commonwealth, 6 Pa. 384; Dougherty v. Commonwealth, 69 Pa. 286; McCue v. Commonwealth, 78 Pa. 185. In the opinion in the case last cited, it was said by AGNEW, C. J.: "It does not appear from the record that the prisoner was asked, before sentence, why sentence of death should not be pronounced upon him. This is a fatal error, and affects the merits of the case. It is necessary to ask the prisoner this, that he may have an opportunity, before the penalty of death be visited upon him, to plead in bar of the sentence any matter sufficient to prevent its execution."

This omission does not however call for a reversal: Jewell v. Commonwealth, 22 Pa. 94; McCue v. Commonwealth, supra. The sentence only will be set aside.

The sentence of the court of oyer and terminer is set aside, and it is ordered that the record be remitted to that court with a procedendo, that the prisoner may be sentenced according to law.