WATTIE WOLFE COMPANY, a corporation, Plaintiff in Error,

v.

SUPERIOR CONTRACTORS, INC., Defendant in Error.

No. 40657.

Supreme Court of Oklahoma.

July 12, 1966.

Felix, Bowman & McIntyre, Oklahoma City, for plaintiff in error.

Charles I. Allen, Oklahoma City, for defendant in error.

LAVENDER, Justice.

The defendant in error, Superior Contractors, Inc., hereinafter called "Superior," sued the plaintiff in error, Wattie Wolfe Company, a corporation, hereinafter called "Wolfe," and United Builders, Inc., hereinafter called "United," for a money judgment against Wolfe in the principal amount of $1,720.79 for labor performed and materials furnished, as shown by an itemized statement attached to the petition, showing total charges of $2,090.12, a credit of $369.33, and a balance due of $1,720.79, with interest thereon and costs, including a reasonable attorney's fee, and also prayed for judgment against United, as a stakeholder only, requiring it to pay to Superior, out of money owed by United to Wolfe under a certain sub-contract between them, the amount of such judgment against Wolfe, with interest thereon, attorney's fee and costs.

Wolfe filed an answer in which it admitted that it is a corporation and was a sub-contractor under United as prime contractor, on the "Rapcon" project at Tinker Air Force Base near Oklahoma City, and alleged that the $369.33 credit shown on the above mentioned itemized statement represents a check in that amount dated September 25, 1962, stating on its face that it is in full settlement of account for "2 road crossings at Rapcon—Tinker;" that the work so referred to on said check consisted of compacting a sewer line ditch across the entrance to a parking lot on such project and paving over the same, and compacting and paving over a water line ditch and a gas line ditch across a street and paving over the same; that such check was in the amount stated by Superior to be their charge for that work after Wolfe objected to paying Superior for anything else shown on its itemized statement when Wolfe first received a statement from Superior in April of 1962 for $2,090.12 and requested Superior to take out of such statement its charges with respect to "the two road crossings"; that Superior did so and furnished a figure of $369.33, and Wolfe paid Superior that amount by the aforesaid check. The balance of Wolfe's answer consists of an express denial that it ever "engaged" Superior to perform the labor or furnish the materials represented by the $1,720.79 balance shown on Superior's statement, together with an express denial that Wolfe is indebted to Superior for the $1,720.79 balance sued for, or in any sum whatever. The answer also contained a verified denial of the correctness of the account attached to Superior's petition with respect to the $1,720.79 claimed, but we note here that at the trial Superior's witnesses testified that all of the items of labor and materials shown on its itemized statement (which was identified and received in evidence without objection) were furnished by it in correcting defects in the entire sewer line ditch mentioned in Wolfe's answer, after government inspectors had rejected the work of another company with which Wolfe had contracted for such ditch work, and in compacting and paving over the water line and gas line ditches mentioned in Wolfe's answer, and that the charges therefor shown on the itemized statement were "standard" in the area involved, and Wolfe did not at the trial and on appeal does not question any of such testimony, but only its obligation to pay for anything other than the "2 road crossings" covered by its $369.33 check which is shown as a credit on such statement.

The cause was tried, by agreement, to the court without a jury. At the close of the trial, the court, without making any specific findings of fact (except for a finding that the parties had stipulated that if an attorney's fee be allowable in such a case $250.00 would be a reasonable amount therefor), found the issues generally in favor of Superior and against Wolfe, and rendered judgment for Superior and against Wolfe in the principal amount of $1,720.79, with interest thereon at the rate of six per cent per annum from the date of such judgment, together with the costs of the action, including an attorney's fee of $250.00 to be taxed as costs, and ordered United to pay the total amount thereof to Superior out of $2,200.00 which United had admitted in its answer it owed to Wolfe under their sub-contract pleaded by Superior.

After the overruling of its motion for a new trial, Wolfe perfected this appeal to this court, and argues all of its assignments of error under two propositions:

(1) That Wolfe did not "engage" Superior to perform the labor or furnish the materials represented by the $1,720.79 sued for; and

(2) That the court erred in rendering judgment on a theory at variance from the issues presented by the pleadings.

In a civil action triable to a jury, where jury is waived and the cause is tried to the court, the findings of the trial court have the force and effect of a jury verdict, and where the finding is a general one it is the finding of every specific thing necessary to be found in sustaining the general verdict, and, in such a case, there being no errors of law, the judgment will not be disturbed on appeal if there is any competent evidence reasonably tending to support the conclusions of the trial court. Scrivener-Stevens Company v. Boliaris, Okl., 385 P.2d 911.

Wolfe raises no particular question concerning the allowance of an attorney's fee for Superior's attorney as an incident to the principal judgment for Superior (in fact, in prayed for an attorney's fee of $500.00 in connection with its prayer that Superior take nothing by its action) or concerning the trial court's order to United to pay the total amount of the judgment to Superior out of the money it admittedly owed Wolfe. It appears to be willing to treat the correctness of these items as dependent upon the correctness of the principal judgment. We shall so treat them.

Wolfe's basic argument is that Superior pleaded an express contract between Wolfe and Superior for Superior to furnish all of the labor and materials involved in all of the ditch work done by Superior and included in its itemized statement, but the evidence failed to establish an express contract covering anything but the "2 road crossings" covered by Wolfe's check for $369.33.

Wolfe then argues that the trial court's judgment for the $1,720.79 balance shown on the itemized statement was based upon estoppel; that facts constituting an estoppel were not pleaded by Superior; that allowing Superior to amend its petition, or considering the petition as having been amended, to plead such facts would constitute a departure from the cause of action as originally pleaded by Superior; and that, therefore, neither the trial court nor this court could consider Superior's petition as having been amended to conform to the proof.

15 O.S.1961, Secs. 131, 132 and 133 provide, respectively:

"A contract is either express or implied." "An express contract is one, the terms of which are stated in words." "An implied contract is one, *the existence of which is manifested by conduct.*" (Emphasis supplied.)

Insofar as any contract between Wolfe and Superior is concerned, the allegations of Superior's petition were as follows:

"That the defendant, Wattie Wolfe Company, a corporation, is indebted to it

in the sum of One Thousand, Seven Hundred Twenty and 79/100 ($1,720.79) Dollars for certain work done between the 10th day of August, 1961, and the 6th day of October, 1961, of the value of $1,720.79 and which sum said defendant agreed to pay."

This was followed by a reference to the verified, itemized statement attached to the petition as a part thereof, with an allegation that the $1,720.79 balance shown thereon is due and wholly unpaid.

█ Although the quoted allegation of Superior's petition is broad enough to include an express contract, it is not limited thereto, and so did not limit Superior to proof of an express contract covering the labor and materials involved in the $1,720.-79 balance claimed by Superior. It is broad enough to allow the establishment, by the conduct of the parties, of the existence of a contract—an implied contract—covering the labor and materials in question. Consequently, the basic question for determination is whether or not the evidence reasonably supports either an express contract or an implied contract covering such labor and materials. United States of America acting by and through its Corps of Engineers, on a certain construction project which is referred to as the "Rapcon" project, at Tinker Air Force Base near Oklahoma City; that its base contract involved the construction of a building which is known as the "Rapcon" center or building, the construction and paving of a parking lot adjoining that building on the north, the construction and paving of a facility which is referred to as a "radar pad," a half-circle upon which various radar facilities would be located, some distance north of the Rapcon building and its parking lot, and the installation of certain electric, gas, water and sewer facilities and lines with all ditches in which such utility lines were laid to be back-filled, compacted and paved over, according to contract specifications; that such base contract provided for inspection

and approval of all such work by the Corps of Engineers before final payment therefor by the government; that United entered into a sub-contract with Superior for the construction and paving of the parking lot adjoining the Rapcon building on the north, and this contract was completed, or practically completed, before the situation involved in this appeal arose; and that United entered into a sub-contract with Boyington Electrical Contractors, hereinafter called "Boyington," for the installation of the electrical facilities and lines, with the electric lines underground, according to the base contract specifications, and after the ditch work of another company with which Boyington had contracted for such work had been inspected and rejected by the Corps of Engineers as not meeting specifications, Boyington contracted with Superior to do the remedial or repair work necessary to bring its ditch work up to base contract specifications.

As further background, indirectly involved in this appeal, it is not disputed that United entered into a sub-contract with Wolfe to perform certain portions of the base contract, including the installation of the required gas, water and sewer lines; that the gas line and water line serving the Rapcon Building crossed the north-south street just east of the Rapcon Building, with each line in its own ditch, which two ditches Wolfe alleged in its answer constituted one of the two "road crossings" covered by its $369.33 check shown as a credit on Superior's itemized statement; that Wolfe's first contract with anyone to compact those two ditches and re-pave the street over them was the one made with Superior; that the sewer line in question herein extended northward from a point near the northeast corner of the Rapcon Building, under a paved entrance to the parking lot from the above mentioned street (the other one of the two "road crossings" which Wolfe alleged in its answer was covered by its $369.33 check), and on northward to and under the

radar pad to other Tinker facilities not involved in the Rapcon project; that Wolfe entered into a contract with Concho Construction Company, hereinafter called "Concho," for the installation of such sewer line, including the back-filling, compacting and paving over of the ditch in which the line was laid, according to the base contract specifications; and that a few weeks prior to August 1, 1961 Concho's ditch work for the entire sewer line had been inspected and rejected by the Corps of Engineers as not meeting base contract specifications, and Concho failed to do the necessary remedial or repair work on such ditch, although Wolfe had made demand on it to do so.

This was the situation when, around the 1st of August, 1961, and after Superior had entered into its contract with Boyington to do the necessary remedial or repair work on Boyington's electric line ditches, two conversations were held, one immediately following the other, near the Rapcon Building, between the construction superintendents for Superior and Wolfe, at which another Wolfe employee was present, which constituted any express contract that was made between Wolfe and Superior concerning the work to be done by Superior.

The first such conversation was held north of the Rapcon Building on the parking lot near where the sewer line in question crossed the entrance to the parking lot and concerned the remedial work to be done by Superior on the sewer line ditch. The second conversation, held immediately after the first one, occurred east of the Rapcon Building and concerned the compacting and paving over of the two ditches for the water and gas lines where they crossed the street east of that building, and it is conceded that there was an express contract made for Superior to do the work it did on those two ditches.

■ Superior contends that the conversation held north of the Rapcon Building constituted an express contract covering the necessary remedial work on the entire sewer line ditch. Wolfe contends that that conversation established an express contract covering only the segment of the sewer line crossing the entrance to the parking lot. Although the two versions of that conversation were in a sense conflicting, we are not required to weigh such evidence but only determine whether or not there was any competent evidence reasonably tending to support the finding and judgment of the trial court. First State Bank of Noble v. McKiddy, 206 Okl. 57, 240 P.2d 1103.

While Superior's construction superintendent, who made whatever contract was made north of the Rapcon Building near where the sewer line crossed the entrance to the parking lot, did not testify that the entire sewer line ditch was specifically mentioned in that conversation, remedial work was needed on the entire sewer line ditch and Concho had failed to do such remedial work, and this witness testified that Wolfe's superintendent asked him how much Superior would charge Wolfe "to make this repair," and the witness told him that Superior had a contract to repair Boyington's electric line ditches on a cost-plus basis and would do "their work" on the same basis, and that Wolfe's superintendent told him to "go ahead and do the work for them." Particularly in the circumstances, this could be construed as covering the entire sewer line ditch.

Furthermore, under undisputed evidence in the case, Superior did all of the necessary remedial work on the entire sewer line ditch at the same time that it did the remedial work on the sewer line ditch where it crossed the entrance to the parking lot and on the water and gas line ditches where they crossed the street east of the Rapcon Building, and in doing so furnished all of the labor and materials shown on its itemized statement; during the period in which it was doing such work no one else was doing any ditch work on the Rapcon project; during the same period some of Wolfe's representatives who

were in a "somewhat supervisory" capacity were working on the Rapcon project, so that Wolfe knew, or should have known, that Superior was doing all of such work after the making of whatever contract was made about August 1, 1961; and according to Wolfe's own president all of such work was accepted by United and the Corps of Engineers and was "sold" to the government, from which it may logically be inferred that Wolfe tendered all of such work as a part of the performance of its subcontract with United, that the Corps of Engineers inspected such work and approved it as meeting the base contract specifications, and that the government paid United for all of such work and United paid Wolfe for all of such work. Thus, Wolfe, knowing all of the facts, accepted the benefits of all of such work.

15 O.S.1961, Sec. 75 provides that:

"A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it so far as the facts are known, or ought to be known to the person accepting."

■ Rather than resulting in the form of estoppel relied upon by Wolfe in its argument under its second proposition, "equitable estoppel," which is based upon one party's being prejudiced by relying upon the representation, silence, act or omission of the other party, the constituent elements of which form of estoppel must be pleaded and proved by the party relying thereon, we think that under this statute the conduct of the party accepting the benefits of a transaction, with knowledge, either actual or constructive, of all of the pertinent facts, coupled with the conduct of the other party, the benefits of which were so accepted, manifests the existence of a contract covering the transaction—an implied contract.

■ In Ray F. Fischer Company, Inc. v. Loeffler-Green Supply Company, Okl.,

289 P.2d 139, 141, the following rule taken from 13 C.J. 241 and adopted in Tulsa Fuel & Mfg. Co. v. Gilchrist Drilling Co., 79 Okl. 82, 190 P. 399, 400, was quoted with approval by this court:

"A contract implied in fact, or an implied contract in the proper sense, arises where the intention of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts, or, as it has been otherwise stated, where there are circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intent to contract. It follows that the only distinction between this species of contract and express contracts rests in the mode of proof; the nature of the understanding is the same, and both express contracts and contracts implied in fact are founded on the mutual agreement of the parties. The one class is proved by direct, the other by indirect, evidence; in other words, the one must be proved by an actual agreement, while in the case of the other it will be implied that the party did make such an agreement as, under the circumstances disclosed, he ought in fairness to have made. The implication, of course, must be a reasonable deduction from all the circumstances and relations of the parties, although it need not be evidenced by any precise words, and may result from random statements and uncertain language."

■ We think that the circumstances set forth in 15 O.S.1961, Sec. 75, supra, are "circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intent to contract," and that the conduct of the parties in the case at bar manifested the existence of a contract between them for Superior to do all of the work that it did. As mentioned above, there is no question concerning the amount of

Wolfe's obligation, if there was a contract covering the entire sewer line ditch.

We find no prejudicial error in the proceedings in the trial court, and its judgment is affirmed.

JACKSON, V. C. J., and DAVISON, WILLIAMS, BERRY and HODGES, JJ., concur.

HALLEY, C. J., and BLACKBIRD, J., dissent.