Commonwealth *v.* Hoss, Appellant.

100

Argued March 24, 1971. Before Bell, C. J., Jones, Eagen, O'Brien, Roberts, Pomeroy and Barbieri, JJ.

*Edgar M. Snyder* and *Fred E. Baxter, Jr.,* Assistant Public Defenders, with them *George H. Ross,* Public Defender, for appellant.

*Carol Mary Los* and *Donald P. Minahan,* Assistant District Attorneys, with them *Robert W. Duggan,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, October 12, 1971:

This direct appeal follows a conviction of first degree murder and the imposition of the death penalty in a trial by jury in Allegheny County for the killing of a Verona Township policeman on September 19, 1969. Appellant, Stanley Hoss, was tried under the Split Verdict Act[1] which provides a two phase trial on the questions of guilt and sentence. He here asserts numerous trial errors including the prejudicial effect of pretrial publicity and the denial of a change of venue, the limits on the scope of questioning at the voir dire, and the admission of certain evidence at the guilt and penalty phases of the trial.[2] Upon review of the record and consideration of these contentions, we affirm the conviction, but conclude that appellant must be afforded a new sentencing hearing because of evidence improperly admitted at the penalty phase of the trial. The facts, viewed in the light most favorable to the Commonwealth, are as follows.

Appellant was incarcerated in the Allegheny County Workhouse pending sentencing on a felonious rape conviction when he escaped on the night of September 9, 1969. Police departments throughout the county were

---

[1] Act of December 1, 1959, P. L. 1621, 18 P.S. §4701.

[2] Appellant does not raise on this appeal the question of the constitutionality of the death penalty. We note that the United States Supreme Court has recently granted certiorari to resolve whether the imposition of the death penalty in these cases constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Aikens v. California,* 403 U.S. 952, 91 S. Ct. 2280 (1971); *Branch v. Texas,* 403 U.S. 952, 91 S. Ct. 2287 (1971); *Furman v. Georgia,* 403 U.S. 952, 91 S. Ct. 2282 (1971); *Jackson v. Georgia,* 403 U.S. 952, 91 S. Ct. 2287 (1971).

promptly notified of the escape but their immediate efforts to recapture appellant failed.

Hoss was first seen by one Fred Mangol on September 19, 1969. Mangol, who had known appellant for eleven years and was aware of his recent escape from prison, immediately notified the Pittsburgh Police Department that appellant had just left a restaurant and was driving a yellow Chevrolet in the direction of Allegheny River Boulevard. This information was relayed by the Pittsburgh Police to the Oakmont Police who in turn notified the Penn Hills and Verona Police Departments. Shortly thereafter, Officer Joseph Zanella of the Verona Police Department spotted a Chevrolet with Ohio license plates. Believing the occupant was the appellant, Officer Zanella had him pull his car over to the side of the road on Plum Street in Oakmont. After giving appropriate warnings, he approached appellant's car with his revolver drawn. Two shots rang out, one of which proved fatal to Officer Zanella. Appellant immediately fled, hitching a ride in the direction of Tarentum, Pennsylvania. Two days later, he abducted Karen Malgott at gunpoint in Lower Burrel, Pennsylvania and forced her to drive him through sections of Maryand and West Virginia. During the 18-hour abduction appellant stated that he had shot a "Verona cop". Appellant was finally captured by the local police in Waterloo, Iowa on October 4, 1969 and immediately arraigned before a United States Commissioner for various federal charges including interstate flight from prosecution which was based on appellant's escape from prison pending sentencing on the rape charge.

Appellant was questioned for several days after his arrest by special agents of the FBI. During the course of interrogation, he confessed the killing of Officer Zanella, the kidnapping of Karen Malgott, and identified the gun used to kill Zanella as belonging to one

Dennis Falconer. Hoss was returned to Pittsburgh on October 9 and the next day was sentenced on the rape charge for which he had been convicted before his escape.

Numerous pretrial motions were filed and orders issued. Trial was had before a jury from March 2 to March 10, 1970, and appellant was found guilty of first degree murder and sentenced to death. Post-trial motions were denied by the court en banc. This appeal followed.

## I. Finding of Guilt
## Pretrial Publicity

Prior to trial, appellant filed a motion requesting a change of venue which was denied. He now contends that the death of the Verona policeman, Officer Zanella, and the events surrounding appellant's escape, arrest, and pending trial generated so much inflammatory publicity that he could not receive a fair trial in Allegheny County. This claim raises two questions: (1) whether the pretrial publicity was so prejudicial that only a change of venue could guarantee appellant a fair trial; (2) whether the precautions taken by the trial court and the conduct of the voir dire were sufficient to provide appellant a fair trial.

The day after appellant's escape and the shooting of Officer Zanella, the media reported the events and mentioned Hoss as the individual who had escaped and "allegedly" shot Officer Zanella. During the next few weeks, the publicity intensified, first after the abducted Karen Malgott was released in West Virginia and identified appellant as the abductor, and second after the media emphasized police suspicions that Hoss had kidnapped a Mrs. Peugeot and her daughter[3] and a nation-

---

[3] During the time period of appellant's escape, a Mrs. Linda Mae Peugeot and her two-year-old daughter, Lori, failed to return

wide search for appellant had commenced. During this same time period, a television interview was conducted with a Mrs. Thompson, mother of the abducted Mrs. Peugeot. The period of intensive publicity lasted for about six weeks after appellant's escape.[4]

On October 30, 1969, the trial court issued an order prohibiting any statements by counsel about any aspect of the case and also wrote letters to all the radio and television stations and the newspapers requesting an abatement of publicity so as not to prejudice appellant's right to a fair trial. From the record, it appears that the court's request was honored because the publicity abated and subsequent news reports were limited to a factual account of the procedural developments of the case.

Courts have not been reluctant to intervene where inflammatory and prejudicial pretrial publicity has undermined the right of the accused to a fair trial. In *Rideau v. Louisiana,* 373 U.S. 723, 83 S. Ct. 1417 (1963), the United States Supreme Court found a denial of due process in a refusal to grant a change of venue where shortly after defendant's arrest a twenty-minute film showing portions of defendant's interrogation *and his confession* was aired over the local television stations. The film was broadcast three times in

to their Cumberland, Maryland, home from a shopping trip. Mrs. Peugeot and her daughter were never found and appellant was suspected of abducting and murdering them.

[4] The following headlines are illustrative of the type of publicity appellant received during this period: "Captive Says Hoss Admitted Slaying"; "Hoss Kidnap Car Believed Found"; "Third Kidnapping Intensifies for Accused Cop-Killer"; "The Search for Hoss Now is Nationwide"; "Police Nab Hoss: Peugeots Missing"; "Hoss Silent on Mother and Child"; "FBI Hunts 2 Feared Abducted by Hoss"; "Hoss' Escape Here Spurs Probe"; "Hoss Given 10 to 20 Years in Rape Case"; "Police Find Blood, Hair in Hoss' Car"; "Reports Say Hoss Admits Killing Peugeots"; "Hoss Admits Killing, Dumping Peugeots"; "Hoss Held, FBI Hunt Stalemated".

three days and the record indicated that sizeable number of the local population of 150,000 people saw the film. Three members of the jury stated on voir dire that they had seen the film but the challenges for cause to exclude them were denied. The Court held that "due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised 'interview'." Id. at 727, 83 S. Ct. at 1420; see *Irvin v. Dowd,* 366 U.S. 717, 725-27, 81 S. Ct. 1639, 1644-45 (1961); cf. *Sheppard v. Maxwell,* 384 U.S. 333, 86 S. Ct. 1507 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S. Ct. 1628 (1965). See also ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press §3.2 (Approved draft, 1966).

The present case does not approach the dimensions of pretrial publicity found in *Rideau* and *Irvin.* In Rideau the entire community was exposed to a live transcription of the accused's confession. In *Irvin,* the barrage of newspaper accounts not only announced the accused's confession but repeatedly thereafter referred to the accused as the "confessed slayer" and reported all the details of the accused's offer to plead guilty. In addition, many editorials condemned his remorseless nature. The day before trial, another confession of the accused was reported. The effects of this pervasive publicity were shown by the voir dire; of the 12 jurors selected, 8 believed the accused to be guilty.

In marked contrast, most of the publicity in the present case involved accounts of appellant's escape, descriptions of the crimes which were largely factual in nature, and the reports on the police efforts to apprehend appellant, as well as reports of the procedural developments of the case after appellant's arrest. The most damaging piece of publicity was the news report, which the FBI refused to confirm, that appellant had confessed. No text of the confession ever appeared

in print. Another article, headlined "Smart Guy Hoss Sees His Luck With Law Run Out", appeared in which a copy of appellant's FBI wanted poster was printed.

The present case is similar to the facts involved in *Commonwealth v. Swanson*, 432 Pa. 293, 248 A. 2d 12 (1968), and *Commonwealth v. Lopinson*, 427 Pa. 284, 234 A. 2d 552 (1967). In *Swanson*, the arrest for armed robbery was preceded by a barrage of publicity (30 newspaper articles and 45 television newscasts in Cambria County—the scene of the crime) and the accused was even described as a "punk, arrogant person". The involvement of the accused in other crimes for which he had not yet been tried was repeatedly referred to by the media. The accused was filmed walking the one and one-half blocks from the jail to his preliminary hearing and arraignment. We held in *Swanson* that because most of the reporting was factual in nature and the only potentially damaging publicity was the speculation by a television station as to the motive for the crime, the denial of change of venue was proper. 432 Pa. 293, 299-300, 248 A. 2d 12, 15-16 (1968).

We cannot find that the pretrial publicity in this case so tainted the community of 1 1/3 million people as to make a fair trial impossible. We consider it significant that as in *Swanson* (9 months) and in *Lopinson* (7 months), there was a lengthy time period between the arrest and trial of more than five months. Furthermore, because of the court's use of control measures, which will be discussed shortly, the publicity was markedly abated during the interval from October 30, 1969 (the date of the court's order regarding publicity) up to the time of trial in March, 1970. In *Swanson* and *Lopinson* there is no indication that such extensive judicial controls were used. In the present case as in *Swanson*, none of the jurors selected stated on voir dire that they had formed opinions as to appellant's guilt.

The trial court did not abuse its discretion in denying the change of venue motion. *Commonwealth v. Swanson,* 432 Pa. 293, 299, 248 A. 2d 12, 15 (1968); *Commonwealth v. Richardson,* 392 Pa. 528, 540, 140 A. 2d 828, 835 (1958). See also ABA Project, Fair Trial and Free Press, supra.

Appellant's counsel submitted 83 proposed questions for voir dire of which only 27 were approved by the court. Appellant now contends that the trial court erred in refusing to approve all of the submitted questions. It is clearly established that "the examination of jurors under voir dire is solely for the purpose of securing a competent, fair, impartial and unprejudiced jury. . . . Neither counsel for the defendant nor for the Commonwealth should be permitted to . . . ask direct or hypothetical questions designed to disclose what a juror's present impression or opinion may be or what his attitude or decision will likely be under certain facts which may be developed in the trial of the case. While considerable latitude should be permitted on a voir dire, the inquiry should be strictly confined to disclosing qualifications or lack of qualifications of a juror and whether a juror has formed a fixed opinion or may be otherwise subject to disqualifications for cause." *Commonwealth v. McGrew,* 375 Pa. 518, 525, 100 A. 2d 467, 470 (1953) (citations omitted); see *Commonwealth v. Swanson,* 432 Pa. 293, 299, 248 A. 2d 12, 15 (1968); *Commonwealth v. Lopinson,* 427 Pa. 284, 297-98, 234 A. 2d 552, 560-61 (1967). Furthermore, "the only legitimate inquiry in this area was whether or not the juror had formed a fixed opinion in the case as to the accused's guilt or innocence." *Commonwealth v. Swanson,* 432 Pa. 293, 300, 248 A. 2d 12, 16 (1968); *Commonwealth v. Corbin,* 426 Pa. 24, 26, 231 A. 2d 138, 139 (1967).

A review of the questions approved reveals that appellant had opportunity to gauge the amount of ex-

posure of each venireman to the publicity in this case.[5] Once the extent of exposure was ascertained, it remained only to determine whether the veniremen had an opinion formed as to the guilt of the accused. Of the 138 jurors questioned on voir dire, only 26 stated they had formed an opinion as to the guilt of appellant. Significantly, in almost every such instance, the court sustained appellant's challenge for cause. Not one of the 12 jurors or 2 alternates selected stated that they had formed an opinion as to the guilt of appellant although all had heard of appellant through the media and about half were familiar with the kidnapping of the Peugeots. On this record, we cannot find an abuse of discretion by the trial court. *Commonwealth v. Lopinson*, 427 Pa. 283, 298, 234 A. 2d 552, 560 (1967). See also ABA Project, Fair Trial and Free Press, supra, at §3.4[6].

---

[5] Some of the questions permitted included: "Do you have any friends or family who live in the Borough of Verona?"; "Do you remember hearing or reading about the defendant, Stanley Hoss, in connection with the death of Edward Zanella, the Verona Police Officer?"; "Does the name Karen Malgott mean anything to you in connection with the defendant, Stanley Hoss". The questions excluded by the trial court included inquiries about the arrest of appellant, the kidnapping of the Peugeots, the TV and radio stations to which the veniremen had been exposed, and other details of the events which had been publicized during the pretrial period.

[6] In *Irvin*, the United States Supreme Court observed: "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S. Ct. 1639, 1642-43 (1961). In the present case, the record indicates that the jurors did not have any preconceived notions to lay aside. Nor was there shown a "pattern of deep and bitter prejudice" in the community as to make suspect the jurors' assertions of neutrality. Id. at 727-28, 81 S. Ct. at 1645.

The precautions of the trial court, taken to control and minimize pretrial publicity, were reasonable and effective in seeking to guarantee appellant a fair trial. The court's request to counsel and the media to eliminate prejudicial publicity is in accord with *Sheppard v. Maxwell* and other authorities.[7]

## Admissibility of Appellant's Statements

Appellant contends that statements made to members of the FBI following his arrest in Waterloo, Iowa, and admitted at trial were taken in violation of *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199 (1964).

---

[7] In *Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507 (1966), the Supreme Court observed that in the area of pretrial publicity, "reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences." Id. at 363, 86 S. Ct. at 1522. Among the measures suggested by the Court were control of press releases, prohibiting those involved in the case from speaking or disseminating information to the press and requesting the press to accurately report the proceedings. Id. at 361-62, 86 S. Ct. at 1521-22. These measures, taken by the trial court, were clearly authorized by Rule 326 of the Pennsylvania Rules of Criminal Procedure which provides that "[i]n a widely-publicized case, the Court . . . may issue a special order governing such matters as extrajudicial statements by parties and witnesses . . . and any other matters the Court may deem appropriate. . . ." See also ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press, §§1.1, 3.1 (Approved draft, 1966). Furthermore, Rule 326 specifically states that "[i]n such cases it may be appropriate for the Court to consult with representatives of the news media concerning the issuance of such a special order." Pa. R. Crim. P. 326; see ABA Project, Fair Trial and Free Press, supra at §3.1. See also A Free Press and a Fair Trial—Symposium, Smith. A judicial View, 11 Vill. L. Rev. 721 (1966); Wilson, Chaos in the Courtroom: Adequate Press Facilities for Highly Publicized Trials, 36 U. Cinn. L. Rev. 210 (1967); Comment, 39 S. Calif. L. Rev. 275 (1966).

In *Massiah,* the Supreme Court held inadmissible statements surreptitiously obtained from the accused after indictment in the absence of counsel without any warnings made as to the right to remain silent or to have counsel present. Id. at 205-07, 84 S. Ct. at 1202-03; *McLeod v. Ohio,* 381 U.S. 356, 85 S. Ct. 1556 (per curiam), rehearing denied, 382 U.S. 874, 86 S. Ct. 15 (1965).

When appellant was finally apprehended in Waterloo, Iowa, on October 4, 1969, an indictment for murder had already been returned against appellant by the Allegheny County Grand Jury on September 22, 1969.[8] Appellant argues that *Massiah* establishes an absolute right to counsel after indictment. We do not agree.

Federal and state courts, though in disagreement as to whether *Massiah* is to be limited to its facts of surreptitious tactics by the police or is to be read more broadly, agree that the right to counsel established by *Massiah* can be surrendered by an intelligent and knowing waiver. *United States v. Crisp,* 435 F. 2d 354, 358 (7th Cir.), cert. denied, 402 U.S. 947, 91 S. Ct. 1640 (1971); *Arrington v. Maxwell,* 409 F. 2d 849, 853 (6th Cir. 1969); *United States ex rel. O'Connor v. New Jersey,* 405 F. 2d 632, 636 (3rd Cir.), cert. denied sub nom. *Yeager v. O'Connor,* 395 U.S. 923, 89 S. Ct. 1770 (1969); *Pryor v. Henderson,* 403 F. 2d 46, 48 (6th Cir. 1968); *State v. Moon,* 183 N.W. 2d 644, 647-48 (Iowa 1971); *Commonwealth v. Frongillo,*      Mass.    , 268 N.E. 2d 341, 344 (1971). Furthermore, it is recognized that *Massiah* must be read in light of the subsequently

[8] This indictment was quashed and a coroner's inquest was held on the ground that the Commonwealth failed to properly secure the permission of the trial court to present the indictment to the Grand Jury while appellant was absent the jurisdiction. Appellant was subsequently indicted for murder on December 2, 1969. In light of our discussion of *Massiah,* we do not consider it necessary to decide the validity of the September 22 indictments.

decided *Miranda*[9] decision. *United States v. Crisp,* 435 F. 2d 354, 358 (7th Cir.), cert. denied 402 U.S. 947, 91 S. Ct. 1640 (1971); *Commonwealth v. Frongillo,* Mass. , 268 N.E. 2d 341, 344 (1971).

Appellant was questioned for several days by special agents of the FBI. All the interrogation sessions were preceded by *Miranda* warnings and none of the sessions lasted for more than a few hours. The main purpose of the interrogations was to secure information about a kidnapping of Mrs. Peugeot and her daughter. During the course of these interrogations, appellant confessed the killing of Officer Zanella and identified the gun used as belonging to one Dennis Falconer. These interrogations, properly preceded by warnings, met the requirements of *Miranda.* We are satisfied that appellant intelligently and knowing waived his right to counsel.

Appellant also contends that the statements were inadmissible under *Miranda* because he was never notified of the charges for which he was being interrogated. The record does not support this claim. Appellant was notified by the first FBI agent who questioned him, Agent Flint, that he was seeking information regarding the kidnapping of the Peugeots and the flight from Pennsylvania and the killing of the police officer. He confessed killing Officer Zanella. Later the same day, appellant was questioned by Agent Mohr. While Mohr gave the proper warnings, the record does not indicate appellant was again informed that the questioning might concern the killing of Officer Zanella. During the course of this interrogation, Hoss identified the gun used to kill Officer Zanella. This statement is admissible simply because there was no requirement for warnings preceding Agent Mohr's permissible questioning. *United States v. Osterburg,* 423 F. 2d 704 (9th Cir.

---

[9] *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966).

1970) ; *Miller v. United States,* 396 F. 2d 492 (8th Cir. 1968) ; *Commonwealth v. Ferguson,* 444 Pa. 478, 282 A. 2d 378 (1971) ; *Sossamon v. State,* 245 Ark. 306, 432 S.W. 2d 469 (1968) ; *State v. Davis,* 261 Iowa 1351, 157 N.W. 2d 907 (1968). These cases make it clear that where there is a time lapse of several hours, the accused is not moved, and there is a clear continuity of interrogation interrupted only by a lapse of time, there is no need for repeated warnings before the second interrogation.

Appellant also challenges the admission of a statement made by him to a Waterloo, Iowa, policeman shortly after his arrest. After proper *Miranda* warnings were given, appellant volunteered that "if he could have gotten into his car, there would have been some dead Waterloo cops." Appellant contends the statement was irrelevant and prejudicial and improperly admitted. We cannot agree. The statements were relevant and admissible as an admission of the accused. *Commonwealth v. Frazier,* 411 Pa. 195, 202, 191 A. 2d 369, 373 (1963) ; 4 Wigmore, Evidence §1048 (3rd ed. 1940). The statement revealed that a belligerent frame of mind, present at the time of appellant's arrest, may have existed when Officer Zanella tried to apprehend him and was killed in the attempt. Evidence of flight is admissible to prove consciousness of guilt. *Commonwealth v. Collins,* 440 Pa. 368, 371-72, 269 A. 2d 882, 884 (1970) ; *Commonwealth v. Osborne,* 433 Pa. 297, 302-03, 249 A. 2d 330, 333 (1969) ; *Commonwealth v. Coyle,* 415 Pa. 379, 393, 203 A. 2d 782, 789-90 (1964) ; 2 Wigmore, Evidence §276 (3rd ed. 1940). Appellant's contention that the statements were not only irrelevant but prejudicial lacks merit. As we said in *Coyle,* supra, "[w]hile the testimony relating to the Coyles' flight included evidence of the commission of other crimes, this did not destroy its admissibility. It was not admitted for the purpose of establishing the Coyle brothers' guilt of

these crimes, but rather to show their consciousness of guilt of the Kane killing and the means employed to escape arrest for that particular crime." 415 Pa. at 393, 203 A. 2d at 789. The testimony in the present case did not include evidence of other crimes but only evidence of a frame of mind which the Commonwealth alleged was present during the commission of the crime.

### Presence at the Change of Venue Hearing

Appellant maintains that he was denied his inherent right to be present at the change of venue hearing held on December 18, 1969. There is much authority to support this claim. It is well established that the accused has a right to be present at every stage of the proceedings in a capital case. *Commonwealth v. Scoleri*, 399 Pa. 110, 124-25, 160 A. 2d 215, cert. denied 364 U.S. 849, 81 S. Ct. 93 (1960); *Commonwealth v. Ballem*, 386 Pa. 20, 123 A. 2d 728, cert. denied 352 U.S. 932, 77 S. Ct. 235 (1956); *Commonwealth ex rel. Tanner v. Claudy*, 378 Pa. 429, 431, 106 A. 2d 401 (1954); *Commonwealth v. Johnson*, 348 Pa. 349, 352, 35 A. 2d 312, 313 (1949); *Commonwealth v. Silcox*, 161 Pa. 484, 496, 29 Atl. 105, 106 (1894); *Dunn v. Commonwealth*, 6 Pa. 384 (1847). These cases would appear to apply to any evidentiary hearing which is held during the course of pretrial proceedings and the trial. The right of the accused to confront all witnesses against him during the course of the proceedings is unquestioned. *United States ex rel. Oliver v. Rundle*, 417 F. 2d 305, cert. denied 397 U.S. 1050, 90 S. Ct. 1388 (1970); *Commonwealth v. Thomas*, 443 Pa. 234, 279 A. 2d 20, 23 (1971). Rule 1117 of the Pennsylvania Rules of Criminal Procedure states that "[t]he defendant shall be present at the arraignment, at every stage of the trial including the impanelling of the jury and the return of the verdict, and at the imposition of sentence. . . ."

Even assuming that appellant's claim is correct, on the record, the defendant's absence from this change of venue proceeding would be harmless error. *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824 (1967) ; *Commonwealth v. Camm,* 443 Pa. 253, 268, 277 A. 2d 325, 333 (1971) ; *Commonwealth v. Padgett,* 428 Pa. 229, 237 A. 2d 209 (1968) ; cf. *United States v. Alper,* 449 F. 2d 1223 (3rd Cir. 1971). We have already concluded that the denial of the change of venue was clearly proper. There is no indication that the defendant desired to testify at the hearing. Furthermore, appellant was in no way deprived of his right to confront witnesses against him because the Commonwealth did not present any witnesses in opposing the motion.

### Admission of the Photograph

The Commonwealth admitted into evidence over the objection of defense counsel a photograph of appellant taken on October 6, 1969, two days after his arrest in Waterloo, Iowa. Appellant maintains that the photograph, having the appearance of a "mug shot", was inadmissible because it suggested that appellant may have been incarcerated for other crimes. *Commonwealth v. Trowery,* 211 Pa. Superior Ct. 171, 235 A. 2d 171 (1967) ; cf. *Barnes v. United States,* 365 F. 2d 509, 511-12 (D.C. Cir. 1966) ; *Commonwealth v. Bruno,* 215 Pa. Superior Ct. 407, 410, 258 A. 2d 666, 668 (1969) ; *Commonwealth v. Allen,* 212 Pa. Superior Ct. 314, 316-17, 242 A. 2d 901, 903 (1968).

Appellant's contention is without record support. Before the photograph was admitted, a sidebar conference was held concerning its admissibility and all police markings were cut off the bottom of the photograph so that when it was admitted it was a front-view, head and shoulders image. The photograph was relevant to show appellant's appearance at the time of his arrest. Fur-

thermore, the court only admitted one of several photographs offered thereby eliminating any likelihood that the jury would consider the group of photographs as "mug shots". Adequate precautions were taken to prevent the jury from viewing the photograph as evidence of other crimes committed by appellant. *Commonwealth v. Luccitti*, 295 Pa. 190, 145 Atl. 85 (1928) (photo admissible which had no markings) ; see *Barnes v. United States*, 365 F. 2d 509, 511-512 (D.C. Cir. 1966).

Admission of Expert Testimony

Appellant objected to the admission of the testimony of William Valenti, a ballistics expert, though the grounds of objection are unclear. There can be no question that Valenti, on the basis of detailed studies of the bullet which killed Officer Zanella and the .22 caliber revolver found in possession of the defendant had sufficient foundation to render the opinion that the bullet *could have been* fired from the .22 caliber revolver. Valenti testified to the number of "matching similarities" such as the "number of lands and grooves, the width of the lands and grooves, the pitch of the lands and grooves, and the depth of the lands and grooves." Furthermore, Valenti admitted freely that he could not conclusively state that the bullet was fired from the gun found in the possession of appellant. The only question raised by Valenti's testimony is its relevance.

Evidence is relevant if it is "tending to prove or disprove the matters in issue." *Commonwealth v. Jones*, 355 Pa. 594, 597, 50 A. 2d 342, 344 (1947) ; McCormick, Evidence §152, at 318-19 (1954) ; 1 Wigmore, Evidence §§9-10, at 289-95 (3rd ed. 1940). Valenti's testimony, which established that the bullet which killed Officer Zanella could have been fired from the same caliber and make of gun found in the possession of appellant,

significantly advanced the inquiry. See *Commonwealth v. McGrew,* 375 Pa. 518, 527, 100 A. 2d 467, 471 (1953); *Commonwealth v. Yeager,* 329 Pa. 81, 89, 196 Atl. 827, 832 (1938); *Commonwealth v. Peronace,* 328 Pa. 86, 195 Atl. 57 (1937).[10]

## II.   Determination of Penalty

At the punishment phase of the trial, the Commonwealth put on the stand six witnesses who testified over objection concerning appellant's alleged abduction of Mrs. Peugeot and her daughter, and another witness,

---

[10] Appellant raises several other contentions which can be disposed of quickly. Appellant maintains that the trial court improperly denied his requests for a continuance, first after the trial court ruled that a Dr. Koskoff could not conduct neurological tests on appellant in his office because of inadequate security, and second at the time appellant received copies of his confessions to the FBI two days before trial. In the first instance, there was no abuse of discretion by the trial court because Dr. Koskoff refused to conduct the tests because of the problems of security raised by the court. Furthermore, Dr. Koskoff did agree to and did in fact review the results of similar tests conducted at the State Correctional Institution. In addition, appellant had two weeks before trial in which to seek other testing arrangements which satisfied the demands of security raised by the court. In the second instance, the substance of the confessions were provided to appellant almost two months before trial. Appellant also contends that the Commonwealth's use of three witnesses not listed on the Bill of Particulars prejudiced appellant. The record indicates that the witnesses were not discovered until the day of trial. Appellant's counsel was given the opportunity to question the witnesses before they testified.

Appellant also contends that his motion to disqualify the judge, based on the judge's telephone call to Dr. Koskoff concerning security arrangements for the scheduled neurological tests, was improperly denied. Appellant maintains this was prejudicial communication between the court and a prospective defense witness. There is no merit to this contention. The court was only exercising its supervisory powers over cases before it by trying to insure the security of the examination to be conducted in a private physician's office.

Agent Dunn of the FBI, who mentioned the pending federal kidnapping indictments against appellant in the Western District of Pennsylvania and in Baltimore, Maryland. Appellant contends that this evidence was inadmissible under the Split Verdict Act.

In *Commonwealth v. Jones,* 355 Pa. 594, 50 A. 2d 342 (1947), which preceded the passage of the Split Verdict Act, we held that "[i]t is well-settled that evidence in proper form of prior convictions of crime is admissible in homicide cases, for the sole purpose of aiding the jury in determining the penalty to be inflicted if it finds the accused guilty of murder in the first degree. . . . A similar rule permits the admission in certain types of homicide cases, of statements or confessions in which the accused admitted the *actual commission* of other crimes to aid the jury in fixing the penalty in a case of murder in the first degree. . . . The appellate courts of this Commonwealth have strictly limited the application of this rule of evidence to certain cases involving either *prior convictions* or admissions by accused of the actual commission of other *crimes* and any attempt to extend this principle to include testimony of *mere arrests* is without foundation in either law or reason." Id. at 597, 50 A. 2d at 344 (emphasis in original) (citations omitted). In *Commonwealth v. McCoy,* 405 Pa. 23, 172 A. 2d 795 (1961), it was firmly established that the passage of the Split Verdict Act in no way affected the type of evidence admissible at the penalty phase: "All that can now be shown on the question of the penalty to be imposed upon an adjudicated first degree murderer, concerning his past criminal tendencies, is his *prior convictions, confessions or admissions.*" Id. at 31, 172 A. 2d at 798 (emphasis added) ; *Commonwealth v. Bell,* 417 Pa. 291, 295-96, 208 A. 2d 465, 468 (1965), cert. denied 384 U.S. 966, 86 S. Ct. 1599 (1966) ; *Commonwealth ex rel. Walls v. Maroney,* 416 Pa. 290, 295, 205 A. 2d 862, 865 (1965).

In *McCoy*, the appellant was convicted of first degree murder under the felony-murder rule, and at the penalty phase of the trial the Commonwealth placed on the stand the victim of a completely unrelated prior robbery who identified appellant as the perpetrator and related the circumstances of the crime. In holding this evidence improperly admitted we observed that "[t]he introduction of such evidence, if approved, would lead to the injection of collateral and diverting issues, and be bound to produce confusion which would deprive an accused of the orderly trial to which he is entitled." 405 Pa. 23, 32, 172 A. 2d 795, 799. Here, the jury heard the testimony of six witnesses which related aspects of the alleged kidnapping, and one witness who informed them of pending federal indictments. The admission of this evidence violated our rule.

In a capital case where a man's life is at stake, it is imperative that the death penalty be imposed only on the most reliable evidence. Prior convictions of record, and constitutionally valid admissions and confessions of other crimes meet this standard of reliability; piecemeal testimony about other crimes for which appellant has not yet been tried or convicted can never satisfy this standard.

Accordingly, the conviction of murder in the first degree is affirmed, the judgment of sentence of death is vacated, and the record is remanded for further sentencing proceedings in accordance with the Split Verdict Act and consistent with this opinion.