## Commonwealth *v.* McGrew, Appellant.

Argued October 12, 1953. Before Stern, C. J., Stearne, Jones, Bell, Chidsey, Musmanno and Arnold, JJ.

520

*John M. Wolford,* for appellant.

*Damian McLaughlin,* District Attorney, for appellee.

OPINION BY MR. JUSTICE BELL, November 17, 1953:
Defendant was convicted of murder in the first degree and the jury fixed the penalty at death. He killed his 3 year old stepson Douglas under very unusual circumstances.

Defendant and Mary Nell McGrew were married in 1948. Their married life was stormy—one week or month would be filled with love and the next with dissension and fighting. Defendant frequently threatened to kill his wife and on at least two occasions they separated due to his excessive drinking, gambling and adulterous conduct with other women. Defendant and his wife finally separated in 1951, although frequently thereafter each of them sought a reconciliation.

On May 15, 1952 the defendant, about four o'clock in the morning, entered a room in his father-in-law's house where Mary Nell McGrew and her children were sleeping. When she woke up, defendant was standing beside her bed holding a pistol in his hand. He told her not to raise her voice, that he had come to kill her. She pleaded with him not to do so and defendant told her he had nothing to live for; that he loved her and

the children and that he was going to kill them all and then kill himself.

Defendant remained in the room with his wife until about seven o'clock in the morning during which time she pleaded for her life and they twice had "marital relations." Throughout the period of his stay there, defendant retained possession of the gun except during the two occasions just mentioned. The two parties talked at great length and defendant finally agreed not to kill his wife if she would consent to go with him at eleven-thirty that morning to New Rochelle, N. Y., although he had no money and no job. When she accepted this offer, defendant then announced that he was taking Douglas with him as a hostage to insure her good faith. He told her that if she called the police he would kill the child.

The defendant left his father-in-law's house about seven o'clock in the morning taking Douglas with him. Mrs. McGrew immediately ran down to the apartment of her parents and told them what had happened. The police were then called and Mrs. McGrew was taken to a magistrate where a warrant was sworn out for the defendant's arrest.

The defendant, upon leaving his wife's house, borrowed an automobile from a friend, stating that the child was sick and had to be taken to a doctor. His whereabouts thereafter were not known until about eight-thirty that morning when he appeared at the home of John Cooley, 801 East 18th Street, Erie, Pa., a witness for the Commonwealth, and requested that breakfast be prepared for the child. The Cooleys then left to go to work while the Defendant and Douglas remained in their apartment.

Later the same morning, after defendant had talked to a number of people over the telephone and had been apprised of the fact that a warrant had issued and

the police were looking for him, a neighbor entered the Cooley apartment and found defendant lying on the floor of the small bedroom and the child, Douglas Mc-Grew, on the bed. The boy was dead, having been shot through the heart. The defendant was severely wounded and, in response to the neighbor's question as to what happened, he said, "I shot myself and the kid, too." When the police arrived at the scene, defendant again reiterated that he had shot the boy and also that he had shot himself. Later, when the murder warrant was read to him, he told the magistrate that he was guilty.

The defendant also made a statement to a County Detective shortly after he shot Douglas, in which he admitted being in his wife's apartment that morning with a gun and of taking the boy with him to make sure that his wife went with him to New Rochelle and of his learning subsequently that his wife had had a warrant issued for his arrest. However, he insisted that in other respects he could not remember what happened.

At the trial defendant took the witness stand and admitted many of the facts above mentioned, but also denied any memory of the actual shooting and of some of the events immediately prior and subsequent thereto. Most important of all, however, he did not deny that he shot his stepson although he stated he could not believe the boy was dead. He based his defense upon his love for Douglas and his wife, thereby attempting to negative intent and thus reduce the crime to second degree murder or at least to avoid the death penalty.

The defendant, prior to trial and at the request of his counsel, had been sent to a state mental hospital for observation in order to determine his mental capacity. The psychiatrist who had charge of him at

that time testified on behalf of (but unfortunately for) the defendant, that there was no evidence of mental illness or of any condition which would require treatment and that defendant knew the difference between right and wrong.

Defendant raises three questions on this appeal: (1) Did the trial Judge commit reversible error in his rulings on the examination of the jury on their voir dire? (2) Did the Court err in admitting the testimony of Lieutenant Whitecotton of the Pennsylvania State Police, who claimed to be an expert on small arms and who expressed the opinion that the gun which killed Douglas McGrew was held at or near contact at the time it was discharged? And (3) Did the Judge err in sustaining an objection to defendant's question, "Mary Nell, isn't it a fact that Oscar also accused you of being unfaithful?" We shall consider these seriatim.

Defendant asked the jury on their voir dire a number of questions designed to reveal whether they would be reluctant or anxious to impose the death penalty. Typical questions are as follows: "(1) Do you think the killing of a child is any more tragic or vicious than the killing of an adult? (2) You say you have no conscientious scruples against the punishment of death in the event you had rendered a verdict of murder in the first degree. Would you say that to render such a punishment would be very unpleasant to you? (3) If you had to inflict or impose the penalty of death would you find it such a task that it was difficult for you?" None of these questions pertained to the qualifications of the jurors; they are obviously intended to inform the defendant as to the juror's leanings toward or against the defendant and the penalty they are likely to impose. The answer to such questions would have, we repeat, no bearing on a juror's qualifications, i.e.,

whether he was competent, fair, impartial and unprejudiced. The trial Judge wisely sustained the Commonwealth's objections to these questions.

Counsel for defendant also attempted to discover the psychological leanings of the jurors by asking them the following typical questions: "When I mention the name Oscar McGrew what is the first thought that comes into your mind?" "Do you read detective stories . . ." and what particular detective stories and what particular books do they read? Obviously these questions have no relation to the qualifications of the respective jurors and are undoubtedly irrelevant. If questions like this were permitted it would often take longer to select a homicide jury than to try the case and would unduly clog the wheels of justice.

Counsel for defendant also asked, "Would you tell me what that opinion was?" "Would you say from your partial opinion that there was a presumption of guilt in your mind rather than a presumption of innocence?" Neither the Commonwealth nor the defendant is entitled on the voir dire of the jury to inquire concerning what the juror's present impressions or opinions are. The only question, as we shall see, is whether they have formed a fixed opinion. The Court wisely sustained objections to these questions.

Typical of the other class of questions to which the Court sustained objections were the following: "Would you tell me what the two persons were accused of in those cases [in which you had sat on the jury]?" "Have you ever studied psychology?" "Do you belong to any clubs in the City of Erie?" "If you had a nasty job to do would you be inclined to hire a person of the negro race rather than a person of the white race, or would you prefer a person of the white race to the negro?" These questions were again obviously irrelevant.

The examination of jurors under voir dire is solely for the purpose of securing a competent, fair, impartial and unprejudiced jury: *Com. v. Thompson,* 328 Pa. 27, 31, 195 A. 115; *Com. v. Henderson,* 242 Pa. 372, 378, 89 A. 567. Neither counsel for the defendant nor for the Commonwealth should be permitted to elicit any information of this nature, or to ask direct or hypothetical questions designed to disclose what a juror's present impression or opinion may be or what his attitude or decision will likely be under certain facts which may be developed in the trial of the case. While considerable latitude should be permitted on a voir dire, the inquiry should be strictly confined to disclosing qualifications or lack of qualifications of a juror and whether a juror has formed a fixed opinion or may be otherwise subject to disqualification for cause. Cf. *Com. v. Bentley,* 287 Pa. 539, 546, 135 A. 310; *Com. v. Van Horn,* 188 Pa. 143, 165, 41 A. 469; *Com. v. Henderson,* 242 Pa. 372, 89 A. 567; *Traviss v. Commonwealth,* 106 Pa. 597; *Com. v. Thompson,* 328 Pa. 27, 195 A. 115.

It is well to recall that as stated in *Com. v. Morgan,* 280 Pa. 67, 71, 124 A. 339, "The 'right of peremptory challenge is not of itself a right to select, but a right to reject, jurors': Com. v. Brown, 23 Pa. Superior Ct. 470, 498." See to the same effect: *Com. v. Henderson,* 242 Pa.; *Com. v. Bentley,* 287 Pa., supra.

The fact that a juror has read or heard about a case and has an impression or an opinion, or a prejudice is not ground for rejection for cause if he testifies and the Court believes that his opinion is not fixed and that he can and will make up his mind solely from the evidence which will be presented at the trial of the case: *Com. v. Crossmire,* 156 Pa. 304, 308, 27 A. 40; *Com. v. Nye,* 240 Pa. 359, 370, 87 A. 585; *Com. v. Eagan,*

190 Pa. 10, 42 A. 374; *Com. v. DePalma*, 268 Pa. 25, 110 A. 756.

What we have just said disposes of defendant's contentions that the Court erred in refusing to sustain defendant's two challenges for cause. In each case the juror had read or heard about the killing and had formed an opinion, but stated that he or she would be guided solely by what was produced at the trial of the case.

Even a statement by a juror that some evidence would be required to change an impression already formed by him would not be grounds for challenge for cause if he likewise said that he would be guided by the evidence: *Com. v. Crossmire*, 156 Pa., supra; *Com. v. Nye*, 240 Pa., supra. Moreover, it is well settled that when, as here, the defense does not exhaust its peremptory challenges, it is harmless error to overrule a challenge for cause which should have been sustained, if the juror is actually excluded by a peremptory challenge: *Com. v. Bibalo*, 375 Pa. 257, 100 A. 2d 45; *Com. v. Mellor*, 11 D. & C. 21 (aff'd 294 Pa. 339, 144 A. 534) ; *Com. v. Fry*, 198 Pa. 379, 48 A. 257; *Com. v. Spahr*, 211 Pa. 542, 80 A. 1084.

It may not be amiss to add that there is neither evidence nor contention in this case that defendant was required to accept a juror who was incompetent or prejudiced or unqualified, or that there was any defect or partiality in the composition of the jury which tried him; nor has he cited a single Pennsylvania authority to support any of his objections or contentions.

It is also well settled that the scope of a voir dire examination rests in the sound discretion of the trial Judge and his decisions, even in a challenge for cause, will not be reversed in the absence of palpable error: *Com. v. Bibalo*, 375 Pa., supra; *Com. v. McCloskey*, 273 Pa. 456, 460, 117 A. 192; *Com. v. DePalma*, 268 Pa.,

supra; *Com. v. Sushinskie,* 242 Pa. 406, 413, 89 A. 564. No error was committed by the trial Judge in respect to his rulings on the questions asked in the jury's voir dire; on the contrary, his discretion was wisely exercised.

Defendant also objects to the admissibility of the testimony of Lieutenant Whitecotton of the Pennsylvania State Police, who had conducted over 500 experiments with firearms in order to familiarize himself with the results of firearms discharged at close range. He testified without objection from the defendant that the gun which killed Douglas McGrew was held at contact or near contact at the time it was discharged. Douglas McGrew was found on a bed in a small room with defendant who several times admitted and never once denied that he had shot him. Whitecotton's testimony was admissible; we add that even if inadmissible, it was, under the circumstances, certainly harmless error.

Defendant's final contention is that the Court erred in refusing to permit him to ask Mary Nell, "Isn't it a fact that Oscar also accused you of being unfaithful?" Defendant had attempted to prove that he was a loving husband and father in order to minimize his punishment, or to show he had no actual intent to kill his son; there was no attempt to prove he killed his son because his wife was unfaithful. The evidence sought to be elicited was clearly irrelevant.

The trial Judge permitted the defendant to prove the history of his life from his birth; his irresponsibility, his immaturity, his lack of stability and his loss of memory. The trial lasted four days. We are convinced from reading the testimony that this was a willful, deliberate, premeditated and inexcusable murder, committed to wreak vengeance upon his wife for not resuming their marital life.

We are constrained to say, notwithstanding the conscientious argument of Court appointed counsel, that defendant's contentions are utterly devoid of merit.

The sentence and judgment of the Court of Oyer and Terminer of Erie County is affirmed.