J-S03010-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| WALTER JOHN SARVIS, | |
| Appellant | No. 2717 EDA 2016 |

Appeal from the Judgment of Sentence Entered July 7, 2016
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0004990-2015

BEFORE: BENDER, P.J.E., PANELLA, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.: **FILED MAY 04, 2018**

Appellant, Walter John Sarvis, appeals from the judgment of sentence of an aggregate term of 17½ to 35 years' incarceration, imposed after he was convicted of aggravated indecent assault of a child and related offenses. On appeal, Appellant alleges, *inter alia*, that the trial court erred by denying his motion to strike a prospective juror for cause, thus forcing him to use a preemptory challenge to remove that individual from the jury pool. After careful review, we vacate Appellant's judgment of sentence and remand for a new trial.

The trial court summarized the facts and procedural history of this case, as follows:

_____

[*] Former Justice specially assigned to the Superior Court.

This case stems from [Appellant's] sexual abuse of a 10-year-old girl ("Victim") that occurred on an ongoing basis for over a year. [Appellant] was previously in a relationship with [V]ictim's mother. During this time, and beyond the termination of the relationship, [Appellant] resided in the house with mother, her two sons[,] and [Victim]. When … [V]ictim was in fourth and fifth grade, her mother would leave for work very early in the morning before the children went to school. … [V]ictim's two brothers would then leave for school, as the middle school started earlier than … [V]ictim's elementary school. [Appellant] would then be alone in the house with Victim and would require her to go down to his bedroom in the basement and undress. [Appellant] sexually abused … [V]ictim, as he fondled … [V]ictim's chest and genitals, penetrated … [V]ictim's vagina with his fingers and made … [V]ictim fondle his penis.

In May of 2015, when [V]ictim was in fifth grade, her class was shown a video on inappropriate touching and related matters. Victim became visibly upset during this video, at which point she left the room and her teacher saw her in the hall and took her to the counselor's office. Victim explained what [Appellant] had been doing to her, and the proper school reporting methods for suspected abuse were initiated. At that point, a criminal investigation began as well as investigations by Children and Youth Services ("CYS") and the Child Advocacy Center. Victim made statements [that] consistently detailed the sexual abuse she endured at the hands of [Appellant].

On February 11, 2016, [Appellant] was found guilty by a jury of three counts of Aggravated Indecent Assault of a Child, three counts of Indecent Assault of a Person Less than 13 years of age, one count of Corruption of Minors, and one count of Endangering Welfare of Children. On July 7, 2016, following [a Sexually Violent Predator (SVP)] Hearing o[n] June 16, 2016, [] Appellant was sentenced to an aggregate term of confinement of 17.5 to 35 years, Tier III Megan's Law Registration and was deemed a[n] [SVP]. On July 14, 2016, [] Appellant filed a "Motion for Reconsideration of Sentence[."] On July 27, 2016, the [c]ourt issued an [o]rder [d]enying [Appellant's] Motion for Reconsideration of Sentence. On August 25, 2016, [] Appellant filed a timely Notice of Appeal. This [c]ourt directed [] Appellant to file a Concise Statement of [Errors] Complained of on Appeal pursuant to Pa.R.A.P. 1925(b). Following a request for [an] extension and the filing of a Statement of Matters Complained of

on Appeal, on December 14, 2016, Appellant filed an Amended Concise Statement of Matters Complained of on Appeal….

Trial Court Opinion (TCO), 7/19/17, at 1-2 (footnotes omitted).

Herein, Appellant presents two issues for our review:

[I.] Did the [t]rial court err in denying the motion of defense counsel to strike for cause Juror #17 at [j]ury selection who reported to the court that he was a coworker of two of the witnesses to be called to testify and that he would have a predisposition to believe them?

[II.] Did the [t]rial court err in finding [Appellant] to be a[n] [SVP] as defined at 42 Pa.C.S.[] § 9799.12 because the Commonwealth failed to establish by clear and convincing evidence that due to a mental abnormality or personality disorder he is likely to engage in predatory[,] sexually violent offense[s] pursuant to 42 Pa.C.S.[] § 9799.24?

Appellant's Brief at 5.

Appellant first challenges the trial court's denial of his motion to strike a prospective juror (hereinafter "Juror 17") for cause, after that juror informed the court that he knew two witnesses who would be testifying for the Commonwealth. Juror 17 testified, upon further questioning, that he believed those two witnesses were 'trustworthy,' and he could not be certain that he would not give greater weight to their testimony, as compared to witnesses he did not know. After this testimony, Appellant moved to strike Juror 17, which the court denied, thus forcing Appellant to use a peremptory challenge to excuse Juror 17. Appellant then exhausted his remaining peremptory challenges. He now argues that he was wrongfully deprived of the peremptory challenge used to strike Juror 17 and, thus, he was denied his right to a fair and impartial jury.

After careful consideration of Appellant's arguments, the record before us, and the case law on which Appellant relies, we are constrained to agree that Appellant is entitled to a new trial.  We begin by recognizing that

> [a] criminal defendant's right to an impartial jury is explicitly guaranteed by Article I, section 9 of the Pennsylvania Constitution, Pa. Const. Art. I, § 9.  The jury selection process is crucial to the preservation of that right.  The relevant principles governing the examination of veniremen to assess their impartiality are set forth in this Court's decision in **Commonwealth v. Drew**, 500 Pa. 585, 459 A.2d 318 (1983):
>
>> It must be remembered the purpose of the *voir dire* examination is to provide an opportunity to counsel to assess the qualifications of prospective jurors to serve. **Commonwealth v. Johnson**, 452 Pa. 130, 305 A.2d 5 (1973); **Commonwealth v. Lopinson**, 427 Pa. 284, 234 A.2d 552 (1967), *vacated and remanded* 392 U.S. 647, 88 S.Ct. 2277, 20 L.Ed.2d 1344, appeal after remand, 449 Pa. 3, 296 A.2d 524, *cert. denied,* 411 U.S. 986, 93 S.Ct. 2269, 36 L.Ed.2d 963 (1973); **Commonwealth v. McGrew**, 375 Pa. 518, 100 A.2d 467 (1953).  It is therefore appropriate to use such an examination to disclose fixed opinions or to expose other reasons for disqualification.  [] **Johnson, supra**; **Commonwealth v. Swanson**, 432 Pa. 293, 248 A.2d 12 (1968), *cert. denied* 394 U.S. 949, 89 S.Ct. 1287, 22 L.Ed.2d 483 (1969); [] **Lopinson, supra**; [] **McGrew, supra**. Thus the inquiry must be directed at ascertaining whether the venireperson is competent and capable of rendering a fair, impartial and unbiased verdict.  [] **Johnson, supra**; [] **Lopinson, supra**; [] **McGrew, supra**. The law also recognizes that prospective jurors were not cultivated in hermetically sealed environments free of all beliefs, conceptions and views.  The question relevant to a determination of qualification is whether any biases or prejudices can be put aside upon the proper instruction of the court. **Commonwealth v. England**, 474 Pa. 1, 375 A.2d 1292 (1977); [] **Johnson, supra**.
>
> **Id.** at 588, 459 A.2d at 320.

A challenge for cause to service by a prospective juror should be sustained and that juror excused where that juror demonstrates through his conduct and answers a likelihood of prejudice. ***Commonwealth v. Colson****,* 507 Pa. 440, 490 A.2d 811 (1985). The decision whether to disqualify a venireman is within the discretion of the trial court and will not be disturbed on appeal absent a palpable abuse of that discretion. [] ***Colson, supra****; **Commonwealth v. Bighum****,* 452 Pa. 554, 307 A.2d 255 (1973); ***Commonwealth ex rel. Fletcher v. Cavell****,* 395 Pa. 134, 149 A.2d 434 (1959); ***Commonwealth v. Pasco****,* 332 Pa. 439, 2 A.2d 736 (1938); ***Commonwealth v. Gelfi****,* 282 Pa. 434, 128 A. 77 (1925).

***Commonwealth v. Ingber***, 531 A.2d 1101, 1102–03 (Pa. 1987).

In this case, Juror 17 indicated that he knew two of the Commonwealth's witnesses in this case, Tom Sherbinko, a teacher, and Catherine Mallam, a guidance counselor.[1] N.T. Jury *Voir Dire*, 2/8/16, at 68. Juror 17 explained that he had worked with Mr. Sherbinko and Ms. Mallam at the school where they taught. *Id.* Juror 17 was thereafter questioned, and answered, in pertinent part, as follows:

THE COURT: Regarding the witnesses you knew, these teachers you just mentioned, do you have any social experience with

---

[1] At trial, Tom Sherbinko testified that he is Victim's teacher, and he observed her sobbing in the hallway after seeing a classroom video about inappropriate touching. *See* N.T. Trial, 2/9/16, at 157. When Mr. Sherbinko asked Victim what was wrong, she said, "that's what my stepdad does to me." *Id.* at 158. Mr. Sherbinko then notified Catherine Mallam, the school guidance counselor, about Victim's remark. *Id.* at 166. Ms. Mallam testified that she spoke with Victim privately and Victim told her that her 'stepdad,' whom she identified as Appellant, "touches her in a way that makes [her] feel uncomfortable." *Id.* at 179. Victim elaborated that Appellant touches "her chest area and her crotch." *Id.* Ms. Mallam then notified the school principal and the school social worker. *Id.*

them in a positive or negative way that would affect your ability to be fair and impartial?

[Juror 17]: Not that I know of. I[] don't believe so, no.

THE COURT: So you'd be able to evaluate their testimony if they testified either way fairly and if they didn't prove their case you'd be able to return a verdict of not guilty, and if they did prove their case --

[Juror 17]: Yeah. I mean, I know them to be trustworthy individuals, and as I said, as long [as] I've known them so --

…

THE COURT: And you had answered that you knew them to be trustworthy. Would you be able to give that not any greater weight because you know them, that you would treat them as any other witness?

[Juror 17]: It's hard to say. It's hard to say, because, again, I do know them and other witnesses I would not know so I would hope that I could be impartial but I mean, it's up to you guys to decide. I mean, I do know them, known them for many years.

THE COURT: Okay. So you'd give them the same test of credibility that you'd give any other witness on the stand?

[Juror 17]: I would like to think I would.

THE COURT: All right. Any other questions?

…

[Defense Counsel]: So how long have you known Tom [Sherbinko]?

[Juror 17]: I've known them both for I'd say maybe 15 to 20 years.

…

[The Commonwealth]: You mentioned that you find the witnesses to be trustworthy and it's hard to say whether you would give their testimony greater weight, right?

[Juror 17]: As a witness I would not know.

[The Commonwealth]: That's your honest opinion?

- 6 -

[Juror 17]: Yes.

…

THE COURT: Let me make sure I understand your final answer. You're not going to give them any greater weight as a witness?

[Juror 17]: I would think I would not but again, because I know them and I believe them to be trustworthy --

[The Commonwealth]: But is it correct to say you don't know whether you can or cant?

[Juror 17]: I would say – I can't say I'm sure that I wouldn't.

[The Commonwealth]: That's your honest answer?

[Juror 17]: Yes.

THE COURT: Do me a favor.  Just stand over there for a second.

Juror 17: Sure.

[Sidebar discussion outside Juror 17's presence.]

THE COURT: What's your feeling on [Juror 17]?

…

[Defense Co-Counsel]: Judge, he said he doesn't know if he can be fair and impartial.  He said --

THE COURT: I heard him say that he would try and be fair and impartial.

[Defense Counsel]: Well, I'm sure he would try.  Of course he would try.

[Defense Co-Counsel]: He said his final answer was, he wasn't sure.

[Juror 17 recalled to the stand.]

THE COURT: … We're having [a] little [inaudible], because you know the witnesses --

[Juror 17]: I'm wavering in my answers.

THE COURT: I asked you a number of questions, and I asked you do you socialize [with the witnesses], and you told me you don't socialize with them?

[Juror 17]: Right. I have not socialized with them.

THE COURT: Now, the real question is, are you going to give them greater weight because you think they're trustworthy because they're teachers, because you know them. You don't know them personally, you don't socialize with them. You have to be able to, if somebody cross-examines them, you doubt their credibility, would you be able to say you know, I don't quite believe you, and that's really where we're at, okay? Their testimony may be fine but it may be subject to cross-examination or [it] might not be. For the defense attorneys, they have to be able to be sure that if they have proven their testimony to be unworthy, not credible, that you'd be able to not believe their testimony. If that was the case, you wouldn't believe them just because they were teachers --

[Juror 17]: Right. That's correct. Yes, I would not believe them just because they're teachers and I worked with them, but the question you asked me was, would I give them more weight than, you know, somebody that I know, that I believe them to be trustworthy from my experience with them. I think I would probably give them more weight than someone I didn't know.

[Defense Counsel]: Sure. You have a predisposition to believe them.

[Juror 17]: Right. I would base my belief on the testimony.

[The Commonwealth]: Would you be able to put all of your prior experiences with them out of your mind and just think about how they testified, what they said, how they said it, were they believable on the stand in this trial?

[Juror 17]: Yes, I believe I would.

THE COURT: You know, just similar to the police question I ask people, a lot of people like police, a lot of people don't like police, but the people that like police, we always ask that [inaudible] the fact that someone is a police officer, we give them no greater weight nor less weight, and that's really the question here. Do you think that again you would evaluate them

fairly and not give them more credibility just because they're in the teaching profession and you think that [inaudible]?

[Juror 17]: I think I would evaluate them fairly. I think I could. I believe I would.

N.T. Trial at 69-76.

At the conclusion of this questioning, defense counsel moved to strike Juror 17 for cause, stressing that "[t]he big issue is that [Juror 17] said that he would give [the two witnesses'] testimony more weight." **Id.** at 78. The court replied, "No, he didn't. No, he didn't. We questioned that and went over that. You're going to have to use a peremptory [strike]. I note your objection." **Id.** Appellant ultimately used a peremptory strike to remove Juror 17 from the jury pool, and he also utilized all of his remaining peremptory strikes in formulating the final jury panel.

Appellant now claims on appeal that the trial court abused its discretion by denying his motion to strike Juror 17. Appellant stresses that the juror informed the court that he believed two of the Commonwealth witnesses were trustworthy, and indicated "that he would be likely to find them more credible than other witnesses." Appellant's Brief at 10. Appellant argues that this case is comparable to **Commonwealth v. Penn**, 132 A.3d 498 (Pa. Super. 2016), where this Court remanded for a new trial after the trial court refused to strike a juror who exhibited a predisposition to believe a police officer. After reviewing **Penn**, and the case on which **Penn** relies, **Commonwealth v. Johnson**, 445 A.2d 509 (Pa. Super. 1982), we are compelled to agree with Appellant.

We begin with **Johnson**, where during *voir dire*, a prospective juror exhibited emotional distress and wavered on whether he could be fair and impartial, because his daughter had been the victim of a rape and robbery that had similar facts as in Johnson's case. When questioned about whether he could be fair, the juror made remarks like, "I think it would be difficult[,]" and "I'm wondering if I am able to do it." **Johnson**, 445 A.2d at 512-13 (citation to the record and emphasis omitted). The juror also repeatedly stated that he was surprised by his strong emotional reaction, and he indicated that he might not have "full control" when following the court's instructions in the case. **Id.** at 513.

Based on this record, the **Johnson** panel concluded that the juror should have been excused for cause. We stressed that the juror

> vividly demonstrated during *voir dire* that he would … likely not … be an impartial juror. He not only visibly manifested emotional distress but specifically expressed substantial doubts about his ability to be impartial at least five times. Although he acknowledged that "logically" he could separate the robbery and rape of his daughter from the robbery of [Johnson's] victims, he added at once that "emotionally, I can see that I don't have full control."

**Id.** at 514. We also concluded in **Johnson** that the juror's "eventual assurance to the court that he would '[b]e fair' did not dispel the force of these admissions." **Id.** (citation omitted). We added:

> This is particularly so in view of the court's questions, which [the juror] may well have understood as suggesting that his proper response, and the response desired by the court, was to say, despite his doubts, that he would be an impartial juror. It is not the court's function to persuade a prospective juror to put aside

doubts expressed, and explained, as earnestly as [this juror's] were.

*Id.* Thus, we held in ***Johnson*** that the trial court abused its discretion by not striking the juror, and that the error was not harmless, given that Johnson was "forced to use one of his peremptory challenges to excuse" the juror, and he "exhaust[ed] his peremptories before the jury was seated…." *Id.* Accordingly, we awarded Johnson a new trial. *Id.*

Relying on ***Johnson***, we reached the same outcome in ***Penn***. There, a prospective juror, R.Z., conveyed to the court during *voir dire* that she had previously worked in law enforcement, and that her boyfriend was a police officer. ***Penn***, 132 A.3d at 500. Accordingly, the following questioning of R.Z. took place:

> [[Penn's] Attorney]: So you're pretty steeped in law enforcement?
>
> A: Yes.
>
> [[Penn's] Attorney]: You would be more likely to believe the testimony of a police officer?
>
> A: Yes.
>
> …
>
> [[Penn's] Attorney]: So you're going to have to hear from two or three police officers in this case. And you—because of your own personal experience in working in law enforcement, you would give them credibility, extra credibility simply because they are police. And there are no right or wrong answers. Would it be hard for you not to believe them?
>
> A: I feel like I would be more inclined to believe them, yes.
>
> [[Penn's] Attorney]: I have nothing else….

[The Commonwealth]: What it comes down to though, the Judge would tell you that you can't give them any more weight or credibility. You would be instructed to do that. Do you think you could follow the instruction and not raise them up because of their position?

A: Yes.

...

[The Commonwealth]: Obviously your relationship with your boyfriend, would that—and the testimony of there being police officers in this case, would you be able to be fair and impartial?

A: I would think so, yes.

[The Commonwealth]: Follow up?

[[Penn's] Attorney]: Well, when you—well, when you say you think so, I mean, basically the entire Commonwealth case is going to be testimony from the police officers. Would it be difficult for you to just not believe them because of your experience? I mean, you've been a police officer, you've worked with police, you're dating a police officer. I presume you have a certain attachment to this profession.

A: Correct.

[[Penn's] Attorney]: I'm not going to offend you in any way if I am—I apologize, but would it be difficult to not—kinship to the police to cause for you not to be able—

A: I think it all comes down to evidence, testimony. So as long as I'd—

[[Penn's] Attorney]: If they got up there and said, we don't know anything and we didn't see anything, I would understand, but if they testify to facts which you believe would be enough to convict, would it be hard for you not to believe them because of your experience? Would you, as you said before, you would be inclined to believe them?

A: (Nods head [in the affirmative].)

[[Penn's] Attorney]: I know it's based on the evidence.

A: Right.

[[Penn's] Attorney]: But there would be an inclination on your part, because of your experience, to be more likely to credit their testimony?

A: I mean—again, I think it comes down to the evidence though.

***Penn***, 132 A.3d at 500-01 (some brackets added).

In holding that R.Z. should have been stricken for cause, we stressed that, like the juror in ***Johnson***, R.Z. "initially indicated that she was incapable of 'rendering a fair, impartial and unbiased verdict.'" ***Id.*** at 504. We also relied on the fact that R.Z. "unequivocally testified during *voir dire* that she 'would be more likely to believe the testimony of a police officer,' thus indicating that [she] was biased in favor of the police and the Commonwealth." ***Id.*** Also similar to the juror in ***Johnson***, "R.Z.'s admitted bias in favor of the police rested on a firm bedrock," given R.Z.'s prior employment in law enforcement, and that her boyfriend was a police officer. ***Id.*** at 505. Finally, the ***Penn*** panel concluded that,

> as in ***Johnson***, R.Z. eventually testified that she would be able to follow the trial court's instructions and render a "fair and impartial" decision. However, in the case at bar, almost immediately after R.Z. testified that she would be able to "be fair and impartial," R.Z. **again** testified that, "because of [her] experience[,] ... [she] would be inclined to believe" the police. Therefore, as we held in ***Johnson***, we hold in the case at bar that "[R.Z.'s] eventual assurance to the [trial] court that [she] would 'be fair' did not dispel the force of [her] admissions" of bias.[5] ***Johnson***, 445 A.2d at 514.
>
> > [5] R.Z.'s declaration that "it comes down to the evidence" also did not dispel her admissions of bias, given that R.Z.'s admitted view of the evidence was that police officers were entitled to more credibility.

- 13 -

***Id.*** (emphasis in original). Given that Penn had used a peremptory strike to excuse R.Z., and then exhausted his remaining peremptory challenges, the ***Penn*** panel granted him a new trial. ***Id.***

In light of ***Johnson*** and ***Penn***, we are compelled to likewise grant Appellant a new trial in this case. Here, Juror 17 repeatedly stated that he believed that Mr. Sherbinko and Ms. Callam were trustworthy, and he indicated at least four times that he would be likely to give their testimony greater weight than other witnesses he did not know. He also explicitly confirmed that he had a "predisposition to believe them." N.T. Jury *Voir Dire* at 75. As in ***Johnson*** and ***Penn***, Juror 17 exhibited a clear bias in favor of these Commonwealth witnesses. The testimony of these witnesses was an important piece of the Commonwealth's case, as it involved Victim's first reports of abuse by Appellant. Also similar to ***Johnson*** and ***Penn***, Juror 17's bias in favor of the Commonwealth rested on a 'firm bedrock' of his 15 to 20 year relationship with Mr. Sherbinko and Ms. Callam.

Moreover, as in ***Johnson***, the court's questioning of Juror 17 was inappropriate in this case. The court effectively cross-examined Juror 17 in an attempt to elicit the court's desired answers. It continuously disregarded Juror 17's wavering about whether he could be fair and impartial, and it refused to accept the juror's statements that he would give greater weight to the testimony of the two Commonwealth witnesses. As set forth *supra*, "[i]t is not the court's function to persuade a prospective juror to put aside doubts expressed, and explained, as earnestly as [this juror's] were."

- 14 -

*Johnson*, 445 A.2d at 514. Because here, the court did just that, we conclude that any remarks by Juror 17 that suggested he could be fair and impartial "did not dispel the force of [his] admissions" that he was predisposed to believing the testimony of these two Commonwealth witnesses.[2]

Finally, as we held in *Johnson* and reiterated in *Penn*, "we must conclude that the error [of not striking Juror 17 for cause] was not harmless: '[w]here, as here, a defendant is forced to use one of his peremptory challenges to excuse a prospective juror who should have been excused for cause, and then exhausts his peremptories before the jury is seated, a new trial will be granted.'" *Penn*, 132 A.3d at 505 (quoting *Johnson*, 445 A.2d

_____

[2] We point out that in the trial court's Rule 1925(a) opinion, it cursorily states, without any discussion, that *Johnson*, and our Supreme Court's decision in *Ingber*, "differ[] greatly" from the present case. TCO at 6. The court then declares that Appellant's case "is more akin to [*Commonwealth*] *v. W.P.*, 691 WDA 2016, 2017 WL 1380759, at *1 (Pa. Super. Apr. 17, 2017)[,] wherein our Superior Court affirmed the trial court's decision to deny Defendant's motion to strike potential jurors for cause where Defendant was on trial for charges relating to sexual assault of a child." TCO at 6. While our review of *W.P.* demonstrates that it is clearly distinguishable from the present case, even if it were not, *W.P.* is an unpublished memorandum decision. "An unpublished memorandum decision shall not be relied upon or cited by a Court or a party in any other action or proceeding, except that such a memorandum decision may be relied upon or cited (1) when it is relevant under the doctrine of law of the case, res judicata, or collateral estoppel, and (2) when the memorandum is relevant to a criminal action or proceeding because it recites issues raised and reasons for a decision affecting the same defendant in a prior action or proceeding." Superior Court Internal Operating Procedures, § 65.37(A).

at 514).  Therefore, we are compelled to vacate Appellant's judgment of sentence and remand for a new trial.[3]

Judgment of sentence vacated.  Case remanded for a new trial. Jurisdiction relinquished.

Judge Panella joins this memorandum.

President Judge Emeritus Stevens files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/4/18

---

[3] In light of our disposition, we need not address Appellant's challenge to his SVP designation, as that sentence is now vacated.