J-S16007-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BOYD OKEE ANDRUS | : | |
| | : | |
| Appellant | : | No. 970 MDA 2018 |

Appeal from the Judgment of Sentence March 29, 2018
In the Court of Common Pleas of Bradford County
Criminal Division at No(s): CP-08-CR-0000694-2016

BEFORE: OTT, J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY OTT, J.:                    **FILED JUNE 28, 2019**

Boyd Okee Andrus appeals from the judgment of sentence imposed on March 29, 2018, in the Court of Common Pleas of Bradford County, following his conviction by jury on charges of Endangering the Welfare of a Child (2 counts), Simple Assault (one count), and Recklessly Endangering Another Person (2 counts). Boyd received an aggregate sentence of six years and four months to 19 years' incarceration. In this timely appeal, Boyd claims he was denied an impartial jury after a venire person made derogatory comments about him to another potential juror and that he is entitled to a new trial because of an inconsistent verdict. After a thorough review of the submissions by the parties, relevant law, and the certified record, we affirm.

We glean the underlying facts of this matter from the trial court's October 18, 2018, Pa.R.A.P. 1925(a) opinion.

[Andrus] left home that morning [August 27, 2016] in a pair of jeans and a white t-shirt. He had the two children with him. Child M, 23 months, was wearing a diaper and Child J, 7 years, was wearing pajama pants. There were no injuries to either child at the time of their departure, between 7:00 - 7:30 a.m. Child J testified that [Andrus] put him out of the car along the side of a road and drove away. Child J attempted to find someone to help him by knocking on a few doors to homes until the final home when someone answered, Rachel Winward. Child J told Winward that his father had put him out on the side of [the] road and he was worried about his little brother, who remained in the car, being left on the side of [the] road also.

Later, Ms. Winward's Father-in-law [John Williams] found the car parked on the side of the road with a dog inside. Lorraine Andrus, who had started looking for her husband and children, came across Williams. She identified the vehicles as her husband's. Wiliams advised her Child J was at Winward's house. They traveled back to Winward's home. State Troopers arrived at the home and Williams took them to where the car had been located.

While at the location of the vehicle, [Andrus] was seen walking from a wooded area through a field of hay, naked, carrying Child M, also naked, over his shoulders "like a sack of potatoes" (one hand grasping ankle and other hand grasping wrist). Child M appeared unconscious and had a bruise on his face and eye swollen shut. [Andrus] was walking toward troopers aggressively yelling "shoot" or "fire." Troopers, who had their weapons drawn and demanded several times for him to put the child down. [Andrus] continued his aggressive approach. A trooper then fired a tazer which struck [Andrus] in the stomach and thigh. He then fell to his knees and then the ground. Child M had begun to slide off his back and a trooper ran to get him. [Andrus] did not fall onto Child M. [Andrus] was taken into custody.

Troopers then took Child M to meet an ambulance. Upon meeting the ambulance, an emergency medical technician recognized Child M had a skull fracture and called ahead to have the air transport prepared to take [Child M] to Geisinger Clinic in Danville, Pa.

Child M suffered bruising over the right side of forehead and under and around right eye, bruising on his back and bruising behind his left ear a fair amount of contusion, large areas of hemorrhage underneath the scalp over the left parietal area, right eye swollen

shut, contusion or hemorrhaging within the orbit of the right eye, three skull fractures (1) over the right brow (2) left parietal bone and (3) on left side of occipital bone, altered neurological state – severe concussion, having arrived at Geisinger "basically in a comatose state." Child required a breathing tube upon initial arrival as breathing was not normal.

Child M's doctor opined that these types of injuries would occur in accidents involving great force, i.e. motor vehicle accidents, falling out second story windows, being beaten, child thrown against a wall or floor – a violent act. He further opined these injuries are not the typical injuries a child can cause to self by falling or walking into something. Child was in danger of death.

Trial Court Opinion, 10/18/ 2018 at 4-5 (citations to record omitted).[1]

Andrus' first claim is he was denied a fair trial due to improper comments made by a venire person during the *voir dire* process. Initially, we note,

[a] criminal defendant's right to an impartial jury is explicitly granted by Article 1, Section 9 of the Pennsylvania Constitution, and the Sixth Amendment of the United States Constitution. The jury selection process is crucial to the preservation of that right. ***Commonwealth v. Ingber***, 516 Pa. 2, 6, 531 A.2d 1101, 1102 (1986). The purpose of *voir dire* is to provide an opportunity to counsel to assess the qualifications of the prospective jurors to serve. It is therefore appropriate to use such an examination to disclose fixed opinions or to expose other reasons for disqualification. ***Commonwealth v. Drew***, 500 Pa. 585, 588, 459 A.2d 318, 320 (1983) (citing ***Commonwealth v. Johnson***, 452 Pa. 130, 305 A.2d 5 (1973)). ***See also Commonwealth v. Lopinson***, 427 Pa. 284, 234 A.2d 552 (1967) and ***Commonwealth v. McGrew***, 375 Pa. 518, 100 A.2d 467 (1953). It is well settled that the sole purpose of examination of jurors under *voir dire* is to secure a competent, fair, impartial and unprejudiced jury. While considerable latitude should be permitted on *voir dire*, the inquiry should be strictly confined to disclosing qualifications of a juror and whether the juror has formed a fixed opinion or may be otherwise subject to disqualification for cause.

---

[1] The trial court opinion addresses issues that were not pursued before our Court.

> ***Drew***, 500 Pa. at 589, 459 A.2d at 320 (citing ***McGrew***, 75 Pa.
> at 524, 100 A.2d at 470).

***Commonwealth v. Ellison***, 902 A.2d 419, 423-424 (Pa. 2006).

Further,

> It is well established that the scope of *voir dire* rests in the sound
> discretion of the trial court, whose decision will not be reversed
> on appeal absent palpable error.

***Commonwealth v. Mattison***, 82 A.3d 386, 397 (Pa. 2013) (citation omitted).

Instantly, there is no question that one of the potential jurors, a prior-coworker of Andrus, made several derogatory comments about Andrus to another potential juror.[2]  These comments were overheard by another juror who reported them to a court officer who informed the court.  In an abundance of caution, every juror from the row in which the prejudiced juror sat, as well as all jurors from the two rows in front of and two rows behind that row were questioned.  All jurors who heard the comments were dismissed from the panel.  The majority of jurors informed the court and counsel that they had not heard the comments; some may have been aware that jurors were talking, but they never heard the substance of the conversation.  After the potential jurors had been questioned, this exchange took place:

> THE COURT: I'm inclined to grant those challenges for cause just
> because of the types of comments that were made.  So I'm going

---

[2] We recognize that labeling the comments as "derogatory" is a mild classification.  Among other comments, the juror stated, "If he got selected he wouldn't leave the court until he [Andrus] was behind bars" and Andrus was "lower than the filth of the earth."  N.T. 1/22/2018, at 89.

to strike 14 and 15. I'm not going to strike 16 and 17, I think we have to have some faith in the - in the jurors and their answers and those individual jurors were probably just minding their own business. And number 20 I will strike.

[DEFENSE COUNSEL] WILSON: Mr. Ondrey is correct, your Honor, number 22 is the other one.

THE COURT: Yes, I was just going to say number 22.

[ADA] ONDREY: So that is –

MR. WILSON: Oh, and - forgive me, the - juror who was – who initiated the comments at first was what number 21?

MR. ONDREY: Twenty-one, yeah.

MR. WILSON: So 22 it the one that was seated next to him?

MR. ONDREY: Correct.

MR. WILSON: **So that – that's satisfactory, your Honor. That would be all of them.**

THE COURT: And unfortunately the - the juror that reported it…

MR. WILSON: Correct.

N.T. Voir Dire, 1/22/2018 at 100-101 (emphasis added).

This quote demonstrates the trial court addressed the problem raised. The trial judge questioned the jurors who were sitting within immediate hearing distance of the offensive comments, and promptly dismissed ALL the jurors who had heard those offensive comments. After the potential jurors who had heard the comments had been dismissed, defense counsel informed the court that those actions were satisfactory. Defense counsel then took part in post-colloquy selection of the jury panel without expressing any further

reservations regarding the possible tainting of the jurors. Accordingly, no outstanding objection remained and the issue was not preserved for appellate review.

Andrus' second claim is he is entitled to a new trial because of the inconsistent verdict delivered by the jury. Despite the severe injuries suffered by Child M, the jury acquitted Andrus of the most serious charge of aggravated assault,[3] convicting him of simple assault. Here, the trial court appropriately noted, "There is a long line of cases from both the Supreme Court of Pennsylvania and the United States Supreme Court which unequivocally permit inconsistent verdicts and prohibit drawing inferences from a jury's verdict of acquittal." Trial Court Opinion, 10/18/2018, at 6-7.

Specifically, we quote the Pennsylvania Supreme Court, in **Commonwealth v. Moore**, 103 A.3d 1240 (Pa. 2014) (cited in the Trial Court Opinion at 7), which states:

> Federal and Pennsylvania courts alike have long recognized that jury acquittals may not be interpreted as specific factual findings with regard to the evidence, as an acquittal does not definitively establish that the jury was not convinced of a defendant's guilt. Rather, it has been the understanding of federal courts as well as the courts of this Commonwealth that an acquittal may merely show lenity on the jury's behalf, or that "the verdict may have been the result of compromise, or of a mistake on the part of the jury." **United States v. Dunn**, 284 U.S. 390, 394, 52 S.Ct. 189, 79 L.Ed. 356 (1932); *see also* [**Commonwealth v.**] **Carter**, 282 A.2d [375] at 376 [(Pa. 1971)]. Accordingly, the United States Supreme Court has instructed that courts may not make factual findings regarding jury acquittals and, thus, cannot "upset"

---

[3] 18 Pa.C.S. § 2702(a)(8).

verdicts by "speculation or inquiry into such matters." ***Dunn***, 284 U.S. at 394, 52 S.Ct. 189.

***Commonwealth v. Moore***, 103 A.3d at 1246.

The jury's acquittal on the charge of aggravated assault along with the conviction of simple assault does not render the verdict infirm. Andrus is not entitled to relief on this issue.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/28/2019